536 A.2d 354

COMMONWEALTH of Pennsylvania

v.

Paul R. SCHAEFFER, Jr., Appellant.

Superior Court of Pennsylvania.

Argued Dec. 9, 1986.

Filed Dec. 29, 1987.

180

Peter T. Campana, Williamsport, for appellant.

Kenneth A. Osokow, Assistant District Attorney, Williamsport, for Com., appellee.

Before CIRILLO, President Judge, and ROWLEY, OLSZEWSKI, DEL SOLE, MONTEMURO, BECK, TAMILIA, KELLY, and POPOVICH, JJ.

CIRILLO, President Judge:

This case concerns the legality of a technique of electronic surveillance known as "participant monitoring," or using a body wire to surreptitiously record a person's conversations. The issue is whether, under the Pennsylvania Constitution, the police need a search warrant based on probable cause to send a confidential informer into the home of an individual to electronically record his conversations and transmit them back to the police. We hold that article I, section 8 of our constitution, which protects the right of the people to be secure from unreasonable searches and seizures, requires a warrant based on probable cause for the electronic seizure of such communications. We therefore reverse the judgment of sentence and remand for a new trial at which the fruits of the warrantless electronic surveillance of the defendant will be excluded.

The appellant Schaeffer was convicted of possession with intent to deliver marijuana and three counts of simple

possession of controlled substances. The police had employed a confidential informant to make a controlled purchase of marijuana from Schaeffer in his home. A number of days later, they equipped the same informer with a body transmitter and sent him into the Schaeffer home to make another buy. As the transaction was occurring, the police monitored and recorded a conversation between Schaeffer and the informer indicating that Schaeffer would have additional marijuana for sale by the evening of a specified date. The day after that date, the police swore out a warrant to search Schaeffer's home, reciting as probable cause the controlled buys the informer had made and the contents of the conversation the police had overheard. The police executed the warrant and seized the drugs that formed the basis for the prosecution.

In a pre-trial suppression motion and in post-trial motions, Schaeffer challenged the constitutionality of the electronic eavesdropping procedure used by the police. The trial court denied the motions, and Schaeffer appealed, alleging that the search of his home violated both the federal and state constitutions.

After Schaeffer filed his appeal, a panel of this court issued an opinion holding that neither the federal nor the state constitution forbids the warrantless electronic interception, transmittal, and recording of a person's conversations in his home where the other party to the conversations has consented to the interception. *Commonwealth v. Harvey*, 348 Pa.Super. 544, 502 A.2d 679 (1985); *accord Commonwealth v. Rodriguez*, 356 Pa.Super. 543, 515 A.2d 27 (1986); *see also Commonwealth v. Frank*, 357 Pa.Super. 442, 448–49, 516 A.2d 64, 68 (1986). Due to the great importance of the issue involved, we ordered this case argued before the court en banc to reexamine whether *Harvey* correctly interpreted the Pennsylvania Constitution as affording no protection from the warrantless electronic seizure by a secret government agent of an individual's conversations in the privacy of his home.

I

Before December 3, 1978, the effective date of the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. §§ 5701–5727, *see* Act of Oct. 4, 1978, No. 164, sec. 3, 1978 Pa.Laws 831, 848, electronic eavesdropping with one party's consent, which the *Harvey* court found not to implicate the state constitutional right to privacy, was a second-degree misdemeanor proscribed by an amendment to Chapter 57 of the Crimes Code, which at that time was entitled "Invasion of Privacy." *See* Act of Dec. 27, 1974, No. 327, 1974 Pa.Laws 1007 (repealed 1978). The remainder of that chapter banned wiretapping. *See* Act of Dec. 6, 1972, No. 334, sec. 1, §§ 5701–5704, 1972 Pa.Laws 1482, 1568–69 (repealed 1978); *accord* Act of July 16, 1957, No. 411, 1957 Pa.Laws 956 (repealed 1972).

The 1978 Act, while retaining and enhancing the criminal penalties for wiretapping and other electronic interceptions of communications, *see* 18 Pa.C.S. § 5703, carved out limited exceptions to these general prohibitions. Most significantly, the Act for the first time in the Commonwealth's history specifically authorized law enforcement officers to engage in wiretapping and electronic surveillance, subject to a stringent procedure for showing probable cause before a superior court judge. *See generally id.* §§ 5708–5726. The Act exempted certain other electronic surveillance techniques from these strictures. The technique used in this case is treated in subsection 5704(2):

§ **5704. Exceptions to prohibition on interception and disclosure of communications**

It shall not be unlawful under this chapter for:

. . . .

(2) Any investigative or law enforcement officer or any person acting at the direction or request of an investigative or law enforcement officer to intercept a wire or oral communication involving suspected criminal activities where:

(i) such officer or person is a party to the communication; or

(ii) one of the parties to the communication has given prior consent to such interception....

*Id.* § 5704(2); *cf.* 18 U.S.C.A. § 2511(2)(c)–(d) (West Supp. 1987).

The *Harvey* court, faced with the contention that 5704(2) was unconstitutional, noted the strong judicial presumption in favor of the constitutionality of a statute and held, among other things, that neither the fourth amendment to the United States Constitution nor article I, section 8 of the Pennsylvania Constitution requires a warrant for the type of electronic participant monitoring which 5704(2) permits. *Accord Rodriguez; Commonwealth v. Hassine,* 340 Pa.Super. 318, 490 A.2d 438 (1985). Although we concur with *Harvey* that the fourth amendment, as interpreted by the United States Supreme Court, imposes no limits on one-party consent eavesdropping, we disagree with its ruling that under the Pennsylvania Constitution the police may engage in such monitoring in a citizen's home without first obtaining a search warrant. We need not find section 5704(2) unconstitutional to arrive at this holding, because a reasonable construction of the Act allows the conclusion that the General Assembly's exemption of participant monitoring from the prohibitions and requirements of the Act was not necessarily a legislative declaration that the practice was free of state constitutional constraints as well.

## A

■ As a matter of federal constitutional jurisprudence, the *Harvey* panel's conclusion that warrantless participant monitoring does not offend the fourth amendment prohibition on unreasonable searches and seizures is correct.

The United States Supreme Court first reviewed the practice in *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), where an informer equipped with an electronic recorder and transmitter surreptitiously intercepted the defendant's statements in his laundry shop and transmitted them to a federal agent. The Court held there was no fourth amendment violation because the informer

had not trespassed on the defendant's premises when he entered them to converse with the defendant. The Court further found it a "farfetched analog[y] which would liken eavesdropping on a conversation, with the connivance of one of the parties, to an unreasonable search and seizure." 343 U.S. at 753–54, 72 S.Ct. at 972; *see also Goldman v. United States*, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942) (warrantless electronic eavesdropping on telephone conversation from adjoining room not a fourth amendment violation); *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (warrantless off-premises wiretapping not a fourth amendment violation).

In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), however, the Court laid the "trespass" theory of fourth amendment protection to rest, holding

the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

389 U.S. at 351–52, 88 S.Ct. at 511 (citations omitted). The Court found that the monitoring and recording of a defendant's words by means of an electronic bugging device attached to the outside of a public telephone booth "violated the privacy upon which he justifiably relied while using. the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* at 353, 88 S.Ct. at 512. The Court had already determined before *Katz* that electronic surveillance could be a "search" and conversations could be "seized" within the meaning of that amendment. *See, e.g., Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (invalidating statute authorizing judicially-ordered electronic eavesdropping as violative on its face of fourth amendment requirement of search warrant particularity); *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961) (warrantless

intrusion into house with "spike mike" violated fourth amendment, fruits of surveillance suppressed).

In *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), the Supreme Court got the chance to reassess *On Lee* in light of the advances in fourth amendment doctrine bringing electronic eavesdropping within its scope. A divided Court reaffirmed the holding of *On Lee*, finding that warrantless eavesdropping on conversations between a suspect and an informant by means of a radio transmitter concealed on the informant's person did not violate the fourth amendment, any more than did a secret informer's reporting a suspect's words to the police or a government agent's secretly recording them, neither of which the Court had found to violate the Constitution. *See Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (secret government informant may report suspect's conversations to the government); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (IRS agent could surreptitiously record defendant's bribe offer). Writing for a plurality of four Justices, Justice White reasoned:

> If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.
>
> ... If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when the same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case.

*White*, 401 U.S. at 751, 752, 91 S.Ct. at 1126, 1126 (plurality opinion). Justice Black concurred in the judgment based on the now-discredited view he had expressed in *Katz*, 389 U.S. at 364–74, 88 S.Ct. at 518–23 (Black, J., dissenting), that the

fourth amendment's prohibition on unreasonable searches and seizures did not apply to eavesdropping on conversations. *White*, 401 U.S. at 754, 91 S.Ct. at 1127 (Black, J., concurring).

An alternative holding of the *White* Court was that *Katz* did not apply retroactively to the pre-*Katz* bugging that took place in *White*. *Id.* at 754, 91 S.Ct. at 1127, 1128 (plurality opinion), 755 (Brennan, J., concurring); *accord Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (plurality opinion) (*Katz* not retroactive). Justice Brennan concurred in the *White* result on the limited grounds of *Katz*'s nonretroactivity, but disagreed with the *White* plurality on the constitutionality of warrantless participant monitoring after *Katz*. Justices Douglas, Harlan, and Marshall each dissented in *White* and would have applied *Katz* retroactively and found the participant monitoring to have violated the fourth amendment.

In summary, after *Katz* and *White*, the fourth amendment warrant requirement applies to electronic eavesdropping conducted by the police without the consent of either party to the conversation, *see Katz; Berger; cf. United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (warrantless monitoring of electronic beeper in home violated fourth amendment), but does not apply where one of the parties to the conversation consents. *See White; Commonwealth v. Donnelly*, 233 Pa.Super. 396, 408–13, 336 A.2d 632, 638–41 (following *White* under fourth amendment), *allocatur refused*, 233 Pa.Super. xxxvi (Pa.1975), *cert. denied*, 424 U.S. 974, 96 S.Ct. 1477, 47 L.Ed.2d 744 (1976); *see also United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

## B

■ Our authority, however, to diverge from the United States Supreme Court by recognizing a higher level of protection for individual rights under our state constitution is well settled. *See generally* Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv.L.

Rev. 489 (1977). "[I]t cannot be doubted that this state has the constitutional power to guard individual rights, including the right to be free from unreasonable searches and seizures, more zealously than the federal government does under the United States Constitution." *Commonwealth v. Beauford*, 327 Pa.Super. 253, 263, 475 A.2d 783, 788 (1984), *appeal dismissed*, 508 Pa. 319, 496 A.2d 1143 (1985); *accord Commonwealth v. Sell*, 504 Pa. 46, 63–64, 470 A.2d 457, 466–67 (1983); *Commonwealth v. Tarbert*, 348 Pa.Super. 306, 309–11, 502 A.2d 221, 222–23 (1985), *allowance of appeal granted*, 511 Pa. 363, 513 A.2d 1381 (1986); *In re Gartley*, 341 Pa.Super. 350, 372, 491 A.2d 851, 863, *allowance of appeal granted*, 508 Pa. 352, 497 A.2d 610 (1985). "[T]he state," therefore, "has the power to impose standards on searches and seizures higher than those required by the Federal Constitution." *Commonwealth v. DeJohn*, 486 Pa. 32, 43, 403 A.2d 1283, 1288 (1979) (plurality opinion) (quoting *Commonwealth v. Harris*, 429 Pa. 215, 219 n. 2, 239 A.2d 290, 292 n. 2 (1968)), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980); *accord Commonwealth v. Leninsky*, 360 Pa.Super. 49, 519 A.2d 984, 986 (1986) (plurality opinion); *Commonwealth v. Walsh*, 314 Pa.Super. 65, 74, 460 A.2d 767, 771, *allowance of appeal denied*, 314 Pa.Super. 65, 460 A.2d 767 (Pa.1983); *see Cooper v. California*, 386 U.S. 58, 62, 87 S.Ct. 788, 791, 17 L.Ed.2d 730 (1967).

In *Sell,* Justice (now Chief Justice) Nix quoted Justice Brennan's guidelines for state courts faced with deciding whether their own constitutions should be interpreted to provide broader protection of individual rights than the United States Supreme Court recognizes under the federal:

> [T]he decisions of the Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and state court judges and members of the bar seriously err if they so treat them. Rather, state court judges, and also practitioners, do well to scrutinize consti-

tutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly claim persuasive weight as guideposts when interpreting counterpart state guarantees.

504 Pa. at 49, 470 A.2d at 459 (quoting Brennan, *supra*, at 502). In *DeJohn*, which one observer has called "a model of state constitutional independence," Galie, *The Pennsylvania Constitution and the Protection of Defendants' Rights 1969–1980: A Survey*, 42 U.Pitt.L.Rev. 269, 287 (1981), our state high court provided further guidance on the deference owed to decisions of the United States Supreme Court:

For a state court interpreting a state constitution, opinions of the United States Supreme Court are like opinions of sister state courts or lower federal courts. While neither binding in a constitutional sense nor precedential in a jurisprudential one, they are entitled to whatever weight their reasoning and intellectual persuasiveness warrant. One would expect a state court to deal carefully with a Supreme Court opinion and to explain forthrightly why it found itself constrained to reason differently. But such a difference in reasoning should be no more alarming than the differences which impel one judge to dissent from another's opinion, one court to disagree with another, or the judges of any court to disagree with a precedent established by their predecessors.

486 Pa. at 44, 403 A.2d at 1289 (plurality opinion) (quoting Falk, *The State Constitution: A More Than "Adequate" Nonfederal Ground*, 61 Calif.L.Rev. 273, 283–84 (1973)); *accord Beauford*, 327 Pa.Super. at 264–65, 475 A.2d at 789.

■ Having taken this counsel to heart, we reject the reasoning of the United States Supreme Court, followed by this court in *Harvey*, which finds that a citizen gives up the right to be free from warrantless electronic seizure of words spoken in his home simply because another party to the conversation has consented to the interception. In the

Commonwealth of Pennsylvania, no citizen should have to expect that the government may immediately and irrevocably seize his private thoughts every time he voices them to another person. Moreover, whatever the distinction between electronic eavesdropping done without consent and electronic eavesdropping done with the consent of a government informant, it does not support a rational conclusion that the first practice is a government "search and seizure" into the speaker's protected zone of privacy while the second practice is not. On the contrary, a more valid distinction for constitutional purposes is between the government's mere use of an informant to recount what someone has told him and its simultaneous electronic monitoring of a man's words spoken in his home, because the latter is a far graver intrusion on privacy and freedom of speech. Without a warrant, such intrusion is manifestly unreasonable, and therefore violative of article I, section 8 of the Pennsylvania Constitution, and we overrule *Harvey* and all other decisions of this court to the extent that they hold otherwise. *Harvey,* 348 Pa.Super. at 554–55, 502 A.2d at 683–84; *Frank,* 357 Pa.Super. at 448–49, 516 A.2d at 68; *Rodriguez,* 356 Pa.Super. at 551–54, 515 A.2d at 31–32; *cf. Hassine,* 340 Pa.Super. at 353–57, 490 A.2d at 456–59 (wiretap). We thus join the high courts of a small minority of jurisdictions that have parted ways with *White* and found that warrantless participant monitoring offends rights guaranteed by their state constitutions. *See State v. Glass,* 583 P.2d 872 (Alaska 1978); *State v. Sarmiento,* 397 So.2d 643 (Fla.1981); *People v. Beavers,* 393 Mich. 554, 227 N.W.2d 511, *cert. denied,* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975); *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216 (1978); *cf. State v. Lee,* 67 Haw. 307, 686 P.2d 816 (1984) (3–2 decision holding one-party consensual monitoring not violative of state constitution); *State v. Lester,* 64 Haw. 659, 649 P.2d 346 (1982) (same, although Menor, J., concurring, would apply the warrant requirement to interceptions in the home); *State v. Reeves,* 427 So.2d 403 (La.1982) (court originally held 6–1 that state constitution required warrant for one-party consent monitoring; on rehearing after acces-

sion of three new justices, held 4–3 that it did not); *Commonwealth v. Thorpe*, 384 Mass. 271, 424 N.E.2d 250 (1981) (warrantless recording didn't violate state search and seizure provision in view of limited scope of surveillance done by policeman whom defendant knew to be such; court nevertheless advised police to obtain warrants for such monitoring where they had probable cause), *cert. denied*, 454 U.S. 1147, 102 S.Ct. 1011, 71 L.Ed.2d 300 (1982). *But see State v. Ridenour*, 453 So.2d 193 (Fla.Dist.Ct.App.1984) (*Sarmiento* no longer good law after amendment to Fla. Const. art. I, § 12).

■ We begin by observing that our state constitution offers more protection to the right to privacy than exists in the federal regime, and hence it recognizes a greater right of the individual to exclude unreasonable impositions by government on private communications. The primary, though not the only, source of such protection in the Pennsylvania Constitution is article I, section 8, which provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8. "Article I, section 8 of the Pennsylvania Constitution, as consistently interpreted by this court, mandates greater recognition of the need for protection from *illegal government conduct offensive to the right of privacy*." *Sell*, 504 Pa. at 67, 470 A.2d at 468 (emphasis added) (rejecting United States Supreme Court precedent and adopting rule of automatic standing to challenge searches involving possessory offenses in Pennsylvania). In *Sell*, the supreme court, through Justice Nix, offered a historical explanation for why the meaning of article I, section 8 could not be confined by narrow interpretations given to the fourth amendment:

[C]onstitutional protection against unreasonable searches and seizures existed in Pennsylvania more than a decade before the adoption of the federal Constitution, and fifteen years prior to the promulgation of the Fourth Amendment. Clause 10 of the Pennsylvania Constitution of 1776 afforded such a guarantee.

. . . .

In construing Article I, section 8, we find it highly significant that the language employed in that provision does not vary in any significant respect from the words of its counterpart in our first constitution. The text of Article I, section 8 thus provides no basis for the conclusion that the philosophy and purpose it embodies today differs from those which first prompted the Commonwealth to guarantee protection from unreasonable governmental intrusion. Rather, the survival of the language now employed in Article I, section 8 through over 200 years of profound change in other areas demonstrates that the paramount concern for privacy first adopted as a part of our organic law in 1776 continues to enjoy the mandate of the people of this Commonwealth.

504 Pa. at 63, 65, 470 A.2d at 466, 467.

Therefore, in applying this guarantee against "unreasonable governmental intrusion," the Pennsylvania Supreme Court "has subjected searches and seizures to standards higher than those required under the Federal Constitution [and in doing so has] noted that *'the right to be free from unreasonable searches and seizures contained in Art. I, § 8 of the Pennsylvania Constitution is tied into the implicit right to privacy in this Commonwealth.'* " *Lunderstadt v. Pennsylvania House of Representatives*, 513 Pa. 236, 247, 519 A.2d 408, 414 (1986) (plurality opinion) (quoting *DeJohn*, 486 Pa. at 49, 403 A.2d at 1291 (plurality opinion)) (emphasis ours).

Indeed, as this court observed in *Beauford*,

Embodied in the constitutional statement[ ] of the principle [in art. I, § 8] is a right to privacy older than either the federal or state constitution. *Commonwealth v.*

*Palms,* 141 Pa.Super. 430, 15 A.2d 481 (1940). The right to be free from unreasonable searches and seizures is at the foundation of our body politic, in direct line with "the proud boast of an Englishman that his home was his castle and that as long as he obeyed the law, the King and his army could not enter it against his will." *Id.,* 141 Pa.Superior Ct. at 439, 15 A.2d at 485.

*Beauford,* 327 Pa.Super. at 261, 475 A.2d at 787; *see also Silverman,* 365 U.S. at 511, 81 S.Ct. at 682 ("The Fourth Amendment, and the personal rights which it secures, have a long history. At the very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.").

■ The right to privacy in Pennsylvania, and hence the right to exclude unreasonable government intrusion, encompasses freedom from disclosure of personal matters. *See, e.g., Denoncourt v. Commonwealth, State Ethics Comm'n,* 504 Pa. 191, 197–98, 470 A.2d 945, 948 (1983) (plurality opinion); *In re June 1979 Allegheny County Investigating Grand Jury,* 490 Pa. 143, 151, 415 A.2d 73, 77 (1980) (Eagen, C.J., joined by O'Brien & Kauffman, JJ; Larsen, J., & Flaherty, J., dissenting on other grounds, concurred in the holding) ("This privacy interest finds explicit protection in the Pennsylvania Constitution, Art. I, § 1...."). In *Denoncourt,* Justice Flaherty summarized some of the underpinnings of our constitutional right to privacy, drawing on the language used half a century earlier by Justice Brandeis to combat the view that warrantless wiretapping did not trench on that right:

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. *They conferred, as against the govern-*

ment, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men. 504 Pa. at 199, 470 A.2d at 948–49 (plurality opinion) (quoting *Olmstead v. United States,* 277 U.S. at 478, 48 S.Ct. at 572 (Brandeis, J., dissenting) (emphasis added)); *accord Commonwealth v. Murray,* 423 Pa. 37, 50–51, 223 A.2d 102, 109–10 (1966) (plurality opinion) (Musmanno, J.).

When it comes to protecting this "most comprehensive of rights," moreover, the nation's High Court concedes that "the protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual states." *Katz,* 389 U.S. at 350–51, 88 S.Ct. at 510–11 (footnotes omitted).

In *Commonwealth v. Beauford,* this court took the first giant step towards recognizing a higher standard of protection from electronic surveillance under the Pennsylvania Constitution than the Federal Constitution provides. We there held that article I, section 8 prohibited the warrantless installation of a pen register on a telephone line to record the destination, time, and length of outgoing calls. We so held despite a provision of the Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5704(5), declaring it "not ... unlawful under this chapter" for a law enforcement officer to use a pen register, and despite a ruling by the United States Supreme Court that warrantless use of pen registers does not offend the fourth amendment. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). We thus disagreed with the Supreme Court on the extent of the individual's "legitimate expectation of privacy" in cases of warrantless electronic surveillance.

*Smith* said that "[i]n determining whether a particular form of government-initiated electronic surveillance is a 'search' within the meaning of the Fourth Amendment, our lodestar is [*Katz* ]," and that under *Katz* "the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been

invaded by government action." 442 U.S. at 739–40, 99 S.Ct. at 2580 (footnote and citations omitted). Thus, to reach its holding that the fourth amendment did not extend to police use of pen registers, the *Smith* Court found that a caller had no "legitimate expectation of privacy" regarding the numbers he dialed on his phone. *Id.* at 742, 99 S.Ct. at 2581.

*Beauford* rejected the reasoning in *Smith* and found that under article I, section 8 an expectation of privacy in numbers dialed was legitimate and therefore constitutionally protected from government surveillance without a warrant. We relied heavily on *DeJohn,* wherein the Pennsylvania Supreme Court rejected the holding of the United States Supreme Court in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) that the fourth amendment did not prohibit the warrantless seizure of banking records, and found that a bank customer's expectation of privacy in her banking records was reasonable, legitimate, and constitutionally protected under article I, section 8. *DeJohn,* in turn, followed the precedent set in *Burrows v. Superior Court,* 13 Cal.3d 238, 529 P.2d 590, 118 Cal.Rptr. 166 (1974), where the California Supreme Court focussed on the sophisticated data-gathering and storage capabilities made possible by modern electronic means, and warned:

> Development of photocopying machines, electronic computers and other sophisticated instruments have accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices.

13 Cal.3d at 247, 529 P.2d at 596, 118 Cal.Rptr. at 172, *quoted in DeJohn,* 486 Pa. at 46, 403 A.2d at 1290 (plurality opinion). Our supreme court agreed, saying "[w]e believe the analysis of the California Supreme Court, in recognizing modern electronic realities, is more persuasive than the simplistic proprietary analysis supposedly rejected in

[*Katz*], used by the court in *Miller.*" 486 Pa. at 47, 403 A.2d at 1290 (O'Brien, J., joined by Eagen, C.J., and Nix, J.; Manderino, J., dissenting on other grounds, concurred in the holding).

Our *Beauford* opinion, in finding the use of pen registers subject to the warrant requirement, also relied on the great caution with which this State has always regarded intrusions on privacy accomplished through electronic surveillance. 327 Pa.Super. at 267–68, 475 A.2d at 790–91; *see, e.g., Commonwealth v. Papszycki,* 442 Pa. 234, 275 A.2d 28 (1971); *Murray,* 423 Pa. at 50–51, 223 A.2d at 109–10 (plurality opinion) (eavesdropping on telephone conversation with one party's consent intruded on privacy rights guaranteed by Pa. Const. art. I, §§ 1, 8); *see also Commonwealth v. Doty,* 345 Pa.Super. 374, 392, 498 A.2d 870, 879 (1985); Pa. House Legislative Journal 3147 (1978) (statement of Rep. Rhodes).

Thus, the recent trend of decisions in Pennsylvania shows a marked refusal by our courts to accept the United States Supreme Court's premise that one gives up all constitutional rights to privacy in certain matters merely by disclosing them to selected other persons.

Of course, all the vaunted additional protection which the Pennsylvania Constitution extends to its citizens' privacy is of no moment in this case if one concludes that electronic eavesdropping through a government informant sent into a person's home does not invade a zone of privacy in which that person may justifiably claim protection. This the *Harvey* court concluded, relying, in our view, on a quite mechanical application of the reasoning employed by the Supreme Court plurality in *White.* The *Harvey* court acknowledged this state's constitutional power to impose higher standards on police searches and seizures than the federal government does under the United States Constitution, and acknowledged that in *Beauford* and *DeJohn* Pennsylvania courts had interpreted article I, section 8 to provide broader protection against unreasonable searches and sei-

zures than the fourth amendment provides. "Nevertheless," the *Harvey* court stated,

it is difficult under any interpretation of Article 1, Section 8, to find a justifiable expectation of privacy with respect to information disclosed during conversation with a third person. Disclosures made during conversation are entirely voluntary. If a citizen voluntarily discloses criminal involvement during conversation with a third person, the Pennsylvania constitutional guarantee against unreasonable searches and seizures does not prevent future disclosure thereof to law enforcement officials. Similarly, the constitutional guarantee does not extend to or prevent a recording of the conversation in order to preserve the same for use in law enforcement activity. Nothing in contemporary constitutional thinking suggests otherwise.

348 Pa.Super. at 555, 502 A.2d at 684.

With all due respect to the author of *Harvey*, whose judicial scholarship and expression of opinion are normally beyond reproach, there is a substantial body of "contemporary constitutional thinking," both judicial and scholarly, suggesting that one-party consensual electronic eavesdropping conducted in a suspect's home without a warrant invades his constitutionally protected sphere of privacy more intrusively than the practice of simply using an informer without a body transmitter to report on a suspect's words. In *White*, in fact, and in *Lopez* before that, four members of the Supreme Court were precisely of that opinion.

As Justice Brennan, one of the four on both occasions, wrote in *Lopez:*

It is not Agent Davis' deception that offends constitutional principles, but his use of an electronic device to probe and record words spoken in the privacy of a man's office. For there is a qualitative difference between electronic surveillance, whether the agents conceal the devices on their persons or in walls or under beds, and conventional police stratagems such as eavesdropping and disguise. The latter do not so seriously intrude upon the right of

privacy. The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak. But as soon as electronic surveillance comes into play, the risk changes crucially. There is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy.

373 U.S. at 465–66, 83 S.Ct. at 1402 (Brennan, J., joined by Douglas and Goldberg, JJ., dissenting). And as Justice Harlan, author of the *Lopez* majority, later recanted and said in *White,*

The impact of the practice of third-party bugging [must] be considered such as to undermine that confidence and sense of security in dealing with one another that is characteristic of individual relationships between citizens in a free society. It goes beyond the impact on privacy occasioned by the ordinary type of "informer" investigation upheld in [*Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966)] and [*Hoffa v. United States*]. The argument of the plurality opinion, to the effect that it is irrelevant whether secrets are revealed by the mere tattletale or the transistor, ignores the differences occasioned by third-party monitoring and recording which insures full and accurate disclosure of all that is said, free of the possibility of error and oversight that inheres in human reporting.

*White,* 401 U.S. at 787, 91 S.Ct. at 1143–44 (Harlan, J., dissenting). And as a constitutional scholar put the distinction between mere informing and electronic monitoring, before the Supreme Court split asunder over the issue in *White:* "[T]he electronic portrayal is more profound—since it includes deception as to one's capacity to reproduce the conversation accurately or transmit it simultaneously—and more inclusive—since the other participant's remarks are heard indiscriminately by, rather than reported selectively to, the nonparty." Greenawalt, *The Consent Problem in*

200

*Wiretapping and Eavesdropping: Surreptitious Monitoring with the Consent of a Participant in the Conversation*, 68 Col.L.Rev. 189, 215 (1968).

Thus, the electronic seizure is more immediate, invasive, and total than mere oral repetition by an informant, and its effects on people's feelings that they are secure in their homes to speak in private are far more insidious. Electronic surveillance, with or without one party's consent, therefore forces the speaker to readjust completely his traditional privacy expectations. Whether such expectations remain societally "legitimate" in today's world is the question we must answer, but we would do well to remember that before the advent of electronic surveillance, society did recognize the legitimacy of the notion of private speech.

The common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others.[2] Under our system of government, he can never be compelled to express them (except when upon the witness-stand); and even if he has chosen to give them expression, he generally retains the power to fix the limits of the publicity which shall be given them.

---

[2] "It is certain every man has a right to keep his own sentiments if he pleases. He has certainly a right to judge whether he will make them public, or commit them only to the sight of his friends." Yates, J., in *Millar v. Taylor*, 4 Burr. 2303, 2379 (1769).

*The Right to Privacy*, 4 Harv.L.Rev. 193, 198 & n. 2 (1890) (authored by Samuel D. Warren & Louis D. Brandeis); *see also Denoncourt*, 504 Pa. at 197–200, 470 A.2d at 948–49 (plurality opinion); *Murray*, 423 Pa. at 50, 223 A.2d at 109 (plurality opinion) ("natural law ... makes the robbery of one's words as much a crime as purloining his money or jewels"); A. Westin, *Privacy and Freedom* 7 (1967).

The individual must keep some facts concerning his thoughts within a small zone of people. At the same time he must be free to pour out his woes or inspirations or dreams to others. He remains the sole judge as to what must be said and what must remain unspoken. This is

the essence of the idea of privacy inherent in the First and Fifth Amendments as well as in the Fourth.

*White,* 401 U.S. at 763, 91 S.Ct. at 1131 (Douglas, J., dissenting); *see also Lopez,* 373 U.S. at 452, 470–71, 83 S.Ct. at 1395, 1404–05 (dissenting opinion) ("Surely high government officials are not the only persons who find it essential to be able to say things 'off the record.' ").

With electronic surveillance, this zone of privacy which allows a man to choose the range of his auditors is gone. The resulting disclosure to the government of private thoughts is not voluntary as the *Harvey* court found, but compelled. *See Osborn v. United States,* 385 U.S. 323, 351–52, 87 S.Ct. 429, 445, 17 L.Ed.2d 394 (1966) (Douglas, J., dissenting); *Lopez,* 373 U.S. at 450, 83 S.Ct. at 1393 (Brennan, J., dissenting). Every speaker knows and accepts as a "condition of human society" that his listener may go to the police, but he does not intend by speaking to give up the right to exclude the police from his home. But if the police are simultaneously recording every word, they are already there, in the home, uninvited, contrary to every reasonable expectation that most people in society still have. A person committing his views "to the sight of his friends" knows he risks misjudging his friends, but he doesn't forfeit the right to determine in the first place to whom he will directly speak. The body bug destroys that right of self-determination, and if people in society come to believe the practice is widespread and done without probable cause, they may begin to fall silent on many occasions when previously they would have felt free to speak, confident in the belief that they could challenge the credibility or memory of the trusted colleague who would betray them.

It is with good reason, therefore, that the main constitutional distinction many authorities draw between participant monitoring and the ordinary reporting of conversations is the far graver and more chilling threat that "body bugging" poses to freedom of speech:

Authority is hardly required to support the proposition that words would be measured a good deal more carefully

and communication inhibited if one suspected his conversations were being transmitted and transcribed. Were third-party bugging a prevalent practice, it might well smother that spontaneity—reflected in frivolous, impetuous, sacrilegious, and defiant discourse—that liberates daily life. Much offhand exchange is easily forgotten and one may count on the obscurity of his remarks, protected by the very fact of a limited audience, and the likelihood that the listener will either overlook or forget what is said, as well as the listener's inability to reformulate a conversation without having to contend with a documented record. All these values are sacrificed by a rule of law that permits official monitoring of private discourse limited only by the need to locate a willing assistant.

*White*, 401 U.S. at 787–89, 91 S.Ct. at 1144 (Harlan, J., dissenting) (footnotes omitted).

[t]he differences between talking to a person enswathed in electronic equipment and one who is not are very real, and they cannot be reduced to insignificance by verbal legerdemain. All of us discuss topics and use expressions with one person that we would not undertake with another and that we would never broadcast to a crowd. Few of us would ever speak freely if we knew that all our words were being captured by machines for later release before an unknown and potentially hostile audience. No one talks to a recorder as he talks to a person.

*Holmes v. Burr*, 486 F.2d 55, 72 (9th Cir.) (Hufstedler, J., dissenting), *cert. denied*, 414 U.S. 1116, 94 S.Ct. 850, 38 L.Ed.2d 744 (1973).

[T]he state argues that there is no difference between talking to a friend who repeats what is told in confidence and talking to one with a transmitter or recorder. All one needs do to refute that statement is to ask the question of oneself; would it make a substantial difference to the speaker to assume the risk, not only that one's confidence will be betrayed by oral recollections, but also the risk that one's remarks will be secretly recorded or broadcast? Certainly, many of the casual,

the caustic, the irreverent remarks would be inhibited, as would criticism of individuals and policies. The employee could not with impunity point to shortcomings in his superiors or in the functions of his office. Families could not freely discuss the foibles of others. Clever prodding may elicit thoughtless comments about sex, religion, politics, acquaintances, personal finances and even one's innermost thoughts. One takes the risk that his friend may repeat what has been said. One shouldn't be required to take the additional risk of an entirely different character—that his conversation is being surreptitiously transcribed or broadcast.

A confidence repeated by a false friend is received by third parties with the attendant circumstances of the "friend's" credibility and memory. One's ill-considered remarks are not thereby preserved for posterity on the reels of magnetic tape nor insulated from the faded memories inherent in the passage of time. Faced with the choice of silence or the risk that comments will be "etched in stone," a speaker may choose the former alternative, to the manifest diminution of the spontaneity which marks our daily discourse.

*State v. Glass,* 583 P.2d at 877–78; *see also White,* 401 U.S. at 762–63, 91 S.Ct. at 1131 (Douglas, J., dissenting); *Lopez,* 373 U.S. at 452, 470, 83 S.Ct. at 1394, 1404 (Brennan, J., dissenting); *Holmes v. Burr,* 486 F.2d at 65 (Hufstedler, J., dissenting); *People v. Hall,* 88 Mich.App. 324, 329–30, 276 N.W.2d 897, 898–99, *leave to appeal denied,* 406 Mich. 941 (1979); The President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* 200–03 (1967) (*"The Threat to Privacy . . . .* Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect on the willingness to voice critical and constructive ideas."), *quoted in Berger v. New York,* 388 U.S. at 125, 87 S.Ct. at 1917 (White, J., dissenting).

■ In this respect, the *Harvey* and *White* courts seriously misconceive the chilling effect that warrantless monitoring has on our citizens' rights by assuming that it forces only "wrongdoers" to engage in "self-censorship" in speaking about their "criminal activities." *See Harvey*, 348 Pa. Super. at 551, 502 A.2d at 682. If this were the only ill effect of such surveillance we would not hesitate to agree that "body bugging" intrudes on no privacy interest that Pennsylvania is prepared to recognize as reasonable. The point *White* and *Harvey* miss, however, is that the risk of warrantless electronic surveillance falls on innocents and criminals alike, because the very premise of a warrantless procedure is that the police can do it without demonstrating before a judicial officer that there is probable cause to believe they will find evidence of a crime.

[I]t is too easy to forget—and, hence, too often forgotten—that the issue here is whether to interpose a search warrant procedure between law enforcement agencies engaging in electronic eavesdropping and the public generally. By casting its "risk analysis" solely in terms of the expectations and risks that "wrongdoers" or "one contemplating illegal activities" ought to bear, the plurality opinion ... misses the mark entirely. On Lee does not simply mandate that criminals must daily run the risk of unknown eavesdroppers prying into their private affairs; it subjects each and every law-abiding member of society to that risk. . . . Abolition of On Lee would not end electronic eavesdropping. It would prevent public officials from engaging in that practice unless they first had probable cause to suspect an individual of involvement in illegal activities and had tested their version of the facts before a detached judicial officer. The interest On Lee fails to protect is the expectation of the ordinary citizen, who has never engaged in illegal conduct in his life, that he may carry on his private discourse freely, openly, and spontaneously without measuring his every word against the connotations it might carry when instantaneously heard by others unknown to him and unfamiliar with his situation or analyzed in a cold, formal record played days,

months, or years after the conversation. Interposition of a warrant requirement is designed not to shield "wrongdoers," but to secure a measure of privacy and a sense of personal security throughout our society.

*White*, 401 U.S. at 789–90, 91 S.Ct. at 1144 (Harlan, J., dissenting).

We have, therefore, considered the legitimate needs of law enforcement to use clandestine means to combat crime, and we wholeheartedly agree with the statements of our Brother Tamilia in the case of *Commonwealth v. Trignani*, 334 Pa.Super. 526, 536, 483 A.2d 862, 867 (1984), where this court dealt with another facet of electronic surveillance, and said that the General Assembly's anti-wiretapping legislation was meant to protect "the right of privacy of law-abiding citizens," not "communications among criminal networks." While we again acknowledge that the police need access to the most modern and effective technological advances in the war on crime, such access without a warrant requirement leaves them free to train these powerful eavesdropping devices on you, me, and other law-abiding citizens as well as the criminal element. *See Glass*, 583 P.2d at 878. Any balancing of the needs of law enforcement against the rights of the citizen has already been done by the framers of the constitution who conditioned searches and seizures for the most part on the prior approval of a detached and neutral magistrate. It is no great burden on the police to require that they restrict participant monitoring to cases where they can show probable cause for a warrant. *See Lopez*, 373 U.S. at 469, 83 S.Ct. at 1404 (Brennan, J., dissenting); Greenawalt, *supra*, at 229.

"Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also of grave concern, not only to the individual, but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be

decided by a judicial officer, not by a policeman or government enforcement agent."

*United States v. Knotts,* 460 U.S. 276, 282, 103 S.Ct. 1081, 1085, 75 L.Ed.2d 55 (1983) (quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)).

We must therefore reject the dissent's proposition that the limitations contained in 5704(2)(ii), i.e., that there be "suspected criminal activity afoot," that the informant's consent be voluntary, and that the prosecutor give prior approval for the interception, "act as an adequate deterrent to inappropriate police activity" and "drastically minimize the likelihood of an invasion of the law abiding citizen's legitimate expectations of privacy." At 400 (Rowley, J., dissenting). The language of 5704(2)(ii) is designed simply to ensure that the informant has indeed voluntarily consented to participate in the interception. *See Commonwealth v. Clark,* 516 Pa. 599, 533 A.2d 1376 (1987). This, coupled with the remaining requirements of 5704(2), necessitating that criminal activity be suspected and that the Attorney General, the District Attorney, or their respective deputies give their approval, in no way provides a sufficient guard to protect citizens from the unwarranted intrusions into their privacy which the constitution was designed to prevent. Under our constitution, prosecutors do not have the authority to approve searches, which would be tantamount to their issuing their own warrants. Law enforcement officers, "engaged in the 'often competitive enterprise of ferreting out crime,' " *Dunaway v. New York,* 442 U.S. 200, 213, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979) (quoting *Johnson,* 333 U.S. at 14, 68 S.Ct. at. 369), are rarely appropriate parties to be determining the adequacy of grounds for a search, and their "suspicions" of criminal activity are not the standard which our constitutional system has chosen to safeguard the rights of citizens against arbitrary intrusions by the government. "Hostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its

adoption affirmed that 'common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant....' " *Id.* (quoting *Henry v. United States,* 361 U.S. 98, 101, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959)). The constitutional standard is probable cause,

> [which] is designed to protect us from unwarranted and even vindictive incursions upon our privacy. It insulates us from dictatorial and tyrannical rule by the state, and preserves the concept of democracy that assures the freedom of its citizens. This concept is second to none in its importance in delineating the dignity of the individual living in a free society.

*Commonwealth v. Miller,* 513 Pa. 118, 127, 518 A.2d 1187, 1191–92 (1986) (Nix, C.J.) (citation omitted).

The question whether the Pennsylvania Constitution forbids warrantless participant monitoring ultimately boils down to whether society recognizes as reasonable and legitimate the ordinary expectation of the individual that his words are not being electronically recorded and transmitted beyond the four walls of his home or office. We find it perfectly reasonable and legitimate for an individual even in this day and age to expect that his words are not subject to warrantless government surveillance, whether or not it is the person spoken to who is doing the bugging. We fail to see how a person's "reasonable expectations" change whether the government plants a bug in his house or sends someone walking into it with a body transmitter. In both cases, the speaker assumes the risk that the person to whom he is directly speaking will report to the police. But in neither case does he expect the added intrusion of the government's recording or listening in on the conversation. The informant's consent to the governmental surveillance can in no wise affect the societal "legitimacy" of the speaker's expectation that he is not being bugged. *See Lopez,* 373 U.S. at 452, 83 S.Ct. at 1394 (Brennan, J., dissenting); *Holmes v. Burr,* 486 F.2d at 66 (Hufstedler, J., dissenting).

We take heed, moreover, that our supreme court in *Sell,* while applauding *Katz*'s result, *see* 504 Pa. at 57–58, 470

A.2d 463–64, criticized the "legitimate expectation of privacy" rationale which Justice Harlan's concurrence in that case had spawned, *see id.*, 504 Pa. at 56–60, 470 A.2d at 463–65, as a dangerous tool used in the hands of the Supreme Court to whittle away at citizens' privacy rights through rulings that increasingly refuse to find "legitimacy" in subjective expectations of privacy. *See id.*, 504 Pa. at 66–67, 470 A.2d at 468. Under article I, section 8, therefore, the court directed us to keep our focus trained squarely on "the critical element of unreasonable governmental intrusion," *id.*, in determining whether the means the police have used to obtain challenged evidence are illegal. Focussing on the unreasonableness of the governmental intrusion which warrantless electronic eavesdropping represents leads us to conclude that the supreme court would agree with us that the warrantless interception of Schaeffer's conversation in his home violated his rights under the state constitution.

We need not speculate on whether our supreme court will ultimately reject the "legitimate expectation of privacy" as the touchstone of constitutional protection from unlawful search and seizure, because the idea that a person loses his legitimate expectation of privacy from electronic surveillance when he confides his words to someone who turns out to be a clandestine recorder for the police is demonstrably fallacious even under the rationale of the Court which has given this idea constitutional credence.

According to *Katz v. United States*, "What a person *knowingly* exposes to the public ... is not a subject of Fourth Amendment protection...." 389 U.S. at 351–52, 88 S.Ct. at 511 (emphasis added). But "[s]o long as a person seeks to preserve his effects as private, *even if they are accessible to the public or to others*, they are constitutionally protected." *Commonwealth v. Platou*, 455 Pa. 258, 266–67, 312 A.2d 29, 34 (1973), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). The idea of *Harvey* and the *White* plurality that a speaker "knowingly" exposes his conversation to the public simply by speaking to another

individual whom he wrongly assumes to be a private person is at odds with the reasoning behind *Beauford,* which rejected the Supreme Court's reasoning that a person knowingly divulges the telephone numbers he dials to the public and therefore has no privacy interest in them simply because the telephone company has access to them in the regular course of business. The private conversation, just like the telephone number, is sought to be preserved as private, even when accessible to "others," and therefore under the *Katz* "legitimate expectation of privacy" rationale deserves constitutional protection. The Supreme Court has plainly held that the fourth amendment prohibits warrantless governmental electronic monitoring where *neither* party to the conversation consents, *see Berger v. New York; Katz v. United States,* and in *Katz,* the Court illustrated one situation where an expectation of privacy from the government's warrantless seizure of words was legitimate: "One who occupies [a telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece *will not be broadcast to the world.*" 389 U.S. at 352, 88 S.Ct. at 511–512 (emphasis added). In the place where Schaeffer spoke, he had, if anything, an even greater expectation that his words would not be "broadcast to the world," because he spoke in his home; and as our state high court has justly said, "Upon closing the door of one's home to the outside world, a person may legitimately expect *the highest degree of privacy known to our society.*" *Commonwealth v. Shaw,* 476 Pa. 543, 550, 383 A.2d 496, 499 (1978) (emphasis added) (quoting *Commonwealth v. Flewellen,* 475 Pa. 442, 446, 380 A.2d 1217, 1220 (1977)); *accord Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Silverman v. United States,* 365 U.S. at 511–12 & n. 4, 81 S.Ct. at 683 & n. 4. The caller in *Katz,* no differently from those who spoke in their homes in *White, Harvey,* and this case, necessarily bore the risk that the person he spoke to would report what he said. Why, then, since the words were subject to oral repetition, did the Court in *Katz* consider it an invasion of a

protected sphere of privacy for the government to simultaneously seize the words without a warrant based on probable cause? The answer is that Katz, just like Schaeffer, spoke in circumstances justifying his belief that he could exclude "the uninvited ear," 389 U.S. at 352, 88 S.Ct. at 511, and that the limited risk of oral betrayal "inherent in the conditions of human society" did not destroy the separate, legitimate expectation that the police could not directly seize the words of his conversation by electronic means without a warrant based on probable cause.

From the standpoint of a person enjoying this legitimate expectation, nothing changes when the party spoken to is an alter ego of the police who cooperates in the bugging. The consenting individual may have forfeited his own right to privacy, and he is free to report whatever he hears, but his actions simply can have no effect on the societal legitimacy of the speaker's expectations that he is not being simultaneously recorded by the government. The risk of oral betrayal remains constant whether there is nonconsensual bugging, one-party consensual bugging, or no bugging at all. If risk of oral betrayal is allowed to defeat the speaker's legitimate expectation of privacy from warrantless electronic surveillance by the police, it must do so whether or not the other party has consented beforehand to the interception, because if the speaker has no right to rely on the trust reposed in his associate, there is no expectation left on which he can base his right to exclude the government. The logical consequence of this interpretation of a person's "reasonable expectations" is that he enjoys no right to privacy in anything he says to anyone, and, therefore, must risk that he is speaking directly to the government any time he says anything to anyone. Under this "informer" theory of the constitutional right to privacy, a person who speaks to another must indeed expect that his words will be "broadcast to the world," and therefore the only "residuum of true privacy" from warrantless electronic intrusion by the government is to speak only when alone, or to remain silent. When the luxury of unmonitored speech is thus constitutionally confined to moments of soli-

tude, it will be just one small step to hold that speakers should expect the government to seize their words whenever they open their mouths. Beyond that, the courts will have nothing to do but await the technological advance which permits the instantaneous reading of the mind to determine whether the constitution recognizes a "legitimate expectation of privacy" in keeping one's thoughts to one's self. *See Olmstead v. United States*, 277 U.S. at 474, 48 S.Ct. at 571 (Brandeis, J., dissenting) ("Advances in the psychic and related sciences may bring means of exploring unexpressed beliefs, thoughts and emotions.... Can it be that the Constitution affords no protection against such invasions of personal security?").

The most apocalyptic vision of the practice of participant monitoring is that, unconstrained by constitutional limitations, it threatens to become a police-state tool of a type totally inconsistent with the free democratic traditions of the American people. "Electronic aids add a wholly new dimension to eavesdropping. They make it more penetrating, more indiscriminate, more truly obnoxious to a free society. Electronic surveillance, in fact, makes the police omniscient; and police omniscience is one of the most effective tools of tyranny." *Lopez*, 373 U.S. at 466, 83 S.Ct. at 1402 (Brennan, J., dissenting).

> The practice of broadcasting private inside-the-house conversations through concealed radios is singularly terrifying when one considers how this snide device has already been used in totalitarian lands. Under Hitler, when it became known that the secret police planted Dictaphones in houses, members of families often gathered in the bathrooms to conduct whispered discussions of intimate affairs, hoping thus to escape the reach of the sending apparatus.

*United States v. On Lee*, 193 F.2d 306, 317 (1951) (Frank, J., dissenting), *aff'd*, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952).

> We are rapidly entering the age of no privacy, where everyone is open to surveillance at all times; where there are no secrets from government....

. . . .

Once electronic surveillance, approved in *Lopez [v. United States]* is added to the techniques of snooping which this sophisticated age has developed, we face the stark reality that the walls of privacy have broken down and all the tools of the police state are handed over to our bureaucracy on a constitutional platter.

. . . .

The time may come when no one can be sure whether his words are being recorded for use at some future time; when everyone will fear that his most secret thoughts are no longer his own, but belong to the Government; when the most confidential and intimate conversations are always open to eager, prying ears. When that time comes, privacy, and with it liberty, will be gone. If a man's privacy can be invaded at will, who can say he is free? If his every word is taken down and evaluated, or if he is afraid every word may be, who can say he enjoys freedom of speech? If his every association is known and recorded, if the conversations with his associates are purloined, who can say he enjoys freedom of association? When such conditions obtain, our citizens will be afraid to utter any but the safest and most orthodox thoughts; afraid to associate with any but the most acceptable people. Freedom as the Constitution envisages it will have vanished.

*Osborn v. United States,* 385 U.S. 323, 341, 349, 353–54, 87 S.Ct. 429, 439, 444, 446, 17 L.Ed.2d 394 (1966) (Douglas, J., dissenting).

Not everyone shares Justice Douglas's dire view of the risk we as a society take by condoning warrantless participant monitoring. For example, Greenawalt in *The Consent Problem in Wiretapping,* after a thorough and careful analysis, concludes that, although participant monitoring does impinge on privacy and freedom of speech, it is a lesser intrusion than that posed by electronic eavesdropping without the consent of any party. Yet even Greenawalt points out the perverse lengths to which the police presum-

ably can go under the "consent" theory of permissible electronic eavesdropping:

Under the majority's view [in *On Lee v. United States*], the proprietor's consent to a visitor's presence, however mistaken he may be about his visitor's true purpose, apparently extends, at least for purposes of the law of evidence, to whatever devices the visitor may bring to record or transmit what he hears—or, presumably, sees. It makes no difference what cause the police have to expect guilt or how serious the invasion of privacy is. If the police, engaged in a fishing expedition among persons whom they had only slight reason to suspect of a crime, equipped a suspect's mistress with a miniature television transmitter, and then watched, as well as listened to, what happened in his bedroom, there would still be no trespass and no constitutional violation.

Greenawalt, *supra*, at 193–94.

Perhaps this passage best demonstrates the shortcomings of the constitutional theory that there is an exception to the warrant requirement in electronic surveillance cases if one party "consents" to the intrusion. Anyone who accepts the premise that there is a constitutionally protected right to privacy must recoil at the idea that the police can overhear and record the intimacies of a man's bedroom without a warrant and without probable cause to believe the suspect has committed a crime, merely by obtaining the "consent" of the other party to the transaction. Yet that is precisely what the current Supreme Court jurisprudence on the fourth amendment ramifications of electronic surveillance apparently would permit. *Cf.* G. Orwell, *1984*, 4 ("The telescreen"), *quoted in United States v. On Lee*, 193 F.2d at 317 (Frank, J., dissenting). *But see Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) ("penumbras" of various provisions of the Bill of Rights combine to create a constitutionally protected sphere of privacy in the marital bedroom); *State v. Solis*, 693 P.2d 518 (Mont.1984) (surreptitious videotaping without a compelling state interest violates Montana Constitution). *See*

*generally* Hodges, *Electronic Visual Surveillance and the Fourth Amendment: The Arrival of Big Brother?* 3 Hastings Const.L.Q. 261 (1976).

In 1984, a year which formed the title for a George Orwell novel foretelling the arrival of Big Brother and the governmental extinguishment of human freedom, we wrote in *Beauford* that the government could not use an electronic device to discover the telephone numbers a citizen dials without a warrant based on probable cause. The apocalyptic vision of Orwell's *1984* has not, in the eyes of most calm observers, come to pass in this country, in part because the courts of this nation have always stood as a bulwark between the awesome powers of the state and the rights of the individual. Now, in 1987, the 200th anniversary of our nation's Constitution, we are asked to determine that a man has no right to expect that he is not speaking directly into a government microphone every time he opens his mouth in the presence of another person. The supreme arbiters of the United States Constitution have held that an American enjoys no such right; we hold that a Pennsylvanian, speaking in the private sanctum of his home, does have that right, and that an adequate, independent, fundamental ground for it exists in the Pennsylvania Constitution, which itself has protected the privacy rights of the citizens of this Commonwealth since before the nation was founded.

## C

The Wiretapping and Electronic Surveillance Control Act explicitly acknowledges that the target of participant monitoring has a legitimate expectation of privacy in his conversation. Section 5704(2)'s exemption of participant monitoring from the prohibitions and requirements of the Act refers to the interception of an "oral communication," which the Act defines as: "Any oral communications uttered by a person *possessing an expectation that such communication is not subject to interception under circumstances justifying such expectation.*" 18 Pa.C.S. § 5702 (emphasis added); *see also id.* (definition of "intercept" as "[a]ural

acquisition of the contents of any wire or oral communication. . . ." (emphasis added)). The definition of "oral communication" virtually mimics the Supreme Court's definition of a constitutionally protected privacy interest as a "justifiable expectation of privacy." *See Smith*, 442 U.S. at 739, 99 S.Ct. at 2580; *Katz*, 389 U.S. at 353, 88 S.Ct. at 512; *cf., e.g., Platou*, 455 Pa. at 267, 312 A.2d at 34. The General Assembly therefore could not, consistently with these definitions, have intended that participant monitoring be free of the warrant requirements of the state or federal constitutions.

■ Our conclusion that the state constitution requires a warrant for one-party consensual electronic eavesdropping therefore does not require us to strike down as unconstitutional subsection 5704(2) of the Act, which states only that that practice when done by law enforcement agents is "not . . . unlawful" *under the Act*. Section 5704(2) therefore allows the police to "intercept" an "oral communication" with one party's consent and the approval of an authorized Commonwealth attorney, *see* 18 Pa.C.S. § 5704(2)(ii), without complying with the "exacting standards" of sections 5708–5723 of the Act, *see Commonwealth v. Checca*, 341 Pa.Super. 480, 492, 491 A.2d 1358, 1364, *allowance of appeal denied*, 341 Pa.Super. 480, 491 A.2d 1358 (Pa.1985), and without risking the civil and criminal penalties that would apply to any other person engaging in such surveillance, *see* 18 Pa.C.S. §§ 5703, 5725–5726. This legislative scheme of exempting participant monitoring from the prohibitions and requirements of the Act cannot, however, be read as an attempt to authorize its practice without a warrant, because that would fly directly in the face of the Legislature's recognition that such monitoring intrudes on a constitutionally protected zone of privacy. In *Beauford*, we similarly found that the Legislature's exemption of the use of pen registers by the police from the Act's strict requirements was not a legislative declaration that such devices were beyond the reach of the article I, section 8, limitation on warrantless searches and seizures, particularly given the

Legislature's desire to proceed cautiously in electronic eavesdropping after several years of prohibition and abuse. 327 Pa.Super. at 267–68, 475 A.2d 790–91 (quoting Pa. House Legislative Journal 3147 (1978) (statement of Rep. Rhodes)). In *State ex rel. Arnold v. County Court,* 51 Wis.2d 434, 187 N.W.2d 354 (1971), the court found that an almost identical statutory exemption making consent monitoring "not unlawful" did not "authorize" consent monitoring nor make its results admissible in evidence, *cf.* 18 Pa.C.S. § 5717(b) ("Any person who, by any means *authorized by this chapter,* has obtained knowledge of the contents of any wire or oral communication [may divulge or testify as to those contents]" (emphasis added)), and in *State v. Ayres,* 118 N.H. 90, 383 A.2d 87 (1978) the court found that a statute permitting participant monitoring did not allow introduction of its fruits into evidence, viewing the purpose of the exception as allowing the police to protect their undercover agent. *See also State v. Brackman,* 178 Mont. at 116–17, 582 P.2d at 1222.

These considerations and others may have been present to the General Assembly that enacted 5704(2), or it may simply have deferred to the courts on the constitutionality of warrantless participant monitoring, while taking care to enunciate that it was not a crime nor was a superior court order necessary to engage in it. *See also Commonwealth v. Doty,* 345 Pa.Super. 374, 392, 498 A.2d 870, 879 (1985) (Wieand, J.) ("It has generally been acknowledged that legislation which authorizes electronic surveillance infringes upon the right of privacy and, therefore, must be strictly construed."), *allowance of appeal denied,* No. 232 M.D. Allocatur Dkt. 1985 (Pa. June 12, 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 185, 93 L.Ed.2d 119 (1986).

We must presume, however, that the General Assembly intended not to violate the Pennsylvania Constitution in enacting subsection 5704(2), *see* 1 Pa.C.S. § 1922(3), and we must also apply "the well-established proposition that a court is not to rule on the constitutionality of a statute unless it is absolutely necessary to do so in order to decide

the issue before it." *Commonwealth v. Cacek,* 358 Pa.Super. 381, 384, 517 A.2d 992, 993 (1986) (quoting *Commonwealth v. Samuels,* 354 Pa.Super. 128, 144–45, 511 A.2d 221, 230 (1986), *rev'd on other grounds,* 516 Pa. 300, 532 A.2d 404 (1987)); *see also United States v. Geller,* 560 F.Supp. 1309, 1313 n. 2 (E.D.Pa.1983), *aff'd per curiam sub nom. United States v. DeMaise,* 745 F.2d 49 (3d Cir.1984), *cert. denied,* 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985).

Our ruling that the police need a warrant to conduct one-party consensual electronic eavesdropping does not directly conflict with the statutory exemption stated in section 5704(2), and therefore there is no present need to affirmatively declare that statute unconstitutional.

Since the statute does exempt such activity, moreover, the "exacting" standards of the wiretap act do not necessarily apply to it, except insofar as they effectuate the constitutional guarantee that search warrants shall issue only upon probable cause, "supported by oath or affirmation subscribed to by the affiant." *Cf. Beauford,* 327 Pa.Super. at 269 n. 7, 475 A.2d at 791 n. 7. On the other hand, search warrants to intercept conversations are not entirely similar to search warrants to seize tangible property, and therefore some analogies to the wiretap act may be useful. For example, orders authorizing interceptions should specify reasonable limitations as to time, place, and identity of the parties whose communications are to be intercepted. *Cf.* 18 Pa.C.S. § 5712(a)–(b).

## II

■ The Commonwealth, in a contention raised for the first time at oral argument before the court en banc, maintains that the affidavit used to obtain the warrant to search Schaeffer's home established sufficient probable cause to support the search even excluding the evidence overheard during the illegally intercepted conversation. We reject this contention.

"In deciding whether a warrant issued in part upon information obtained through exploitation of illegal police conduct is valid, we must consider whether, absent the information obtained through the illegal activity, probable cause existed to issue the warrant." *Commonwealth v. Shaw*, 476 Pa. 543, 555, 383 A.2d 496, 502 (1978). Excising from the search warrant affidavit the information obtained through the illegal electronic surveillance, the evidence upon which the search warrant issued shows that:

1. Between the dates of March 18 and March 25, 1984, the informant bought marijuana from Schaeffer in his home.

2. Between the dates of April 1 and April 6, 1984, the informant again bought marijuana from Schaeffer in his home.

3. On both occasions the marijuana was in "small pre-packaged plastic baggies."

4. The affiant, through his extensive experience in drug investigations, "has learned that individuals who regularly traffic in Controlled Substances frequently pre-package Controlled Substances in small plastic bags, in preparation for sale...."

Even viewing this evidence in the "totality of the circumstances," *see Commonwealth v. Gray*, 509 Pa. 476, 485, 503 A.2d 921, 926 (1985), and in a "common sense, nontechnical, ungrudging and positive manner," *Commonwealth v. Jones*, 506 Pa. 262, 269, 484 A.2d 1383, 1387 (1984), as we are required to do, we must find this information insufficient to establish probable cause to believe that evidence of crime would be found in the suspect's home on April 6, the date of the search. Evidence of previous criminal activity will not support a finding of probable cause to search a home unless it is also shown that the activity continued up to or about the time of the issuance of the warrant. *Id.*, 506 Pa. at 269, 484 A.2d at 1387; *Commonwealth v. Tolbert*, 492 Pa. 576, 580, 424 A.2d 1342, 1344 (1981); *Commonwealth v. Jackson*, 461 Pa. 632, 639–40, 337 A.2d 582, 585, *cert. denied*, 423 U.S. 999, 96 S.Ct. 432, 46 L.Ed.2d 376

(1975); *Commonwealth v. Shaw*, 444 Pa. 110, 113–14, 281 A.2d 897, 899 (1971). In determining whether the Commonwealth's evidence of drug sales from Schaeffer's home preceding issuance of the warrant was stale or whether it showed the probability of criminal activity continuing up to or about the time of the search, we must consider the rule stated by this court in *Commonwealth v. Novak*, 233 Pa. Super. 236, 238–39, 335 A.2d 773, 774–75, *allocatur refused*, 236 Pa.Super. xxxv (Pa.1975), for situations where a magistrate or a reviewing court is forced to assume when "within" a stated period a given transaction occurred:

> Generally when the courts are forced to make an assumption as to when transactions occurred "within" a given period, for purposes of determining probable cause, it must be assumed that the transactions took place in the most remote part of the given period. See 100 A.L.R.2d 532. The reason for this policy is obvious. If this were not the construction given to this phrase, stale information could be made to appear current by the mere use of "within" language. For example, if a dozen drug purchases were made in the first week of January and one wished to obtain a search warrant in the first week of March based solely on this information he would need only say that "within the last two months a dozen purchases were made", rather than "a dozen purchases were made in the first week of January".

*Accord United States v. Button*, 653 F.2d 319, 324–25 (8th Cir.1981); *Commonwealth v. Burke*, 235 Pa.Super. 36, 42, 340 A.2d 524, 527 (1975). Accordingly, having placed Schaeffer's drug sales to the Commonwealth informant at the remotest part of the recited periods, the Commonwealth's affidavit establishes that on March 18 and on April 1, Schaeffer sold marijuana to the informant in his home; the affidavit does not reveal the quantities sold on either occasion, except that on both occasions the marijuana was in a "small" "pre-packaged" baggie. This information does not allow the conclusion that the police would probably find evidence of drug sales in Schaeffer's home on April 6th.

The Commonwealth presents us with several cases where our courts have found evidence of "continuing" criminal activity sufficient to support a finding of probable cause, but each case is distinguishable. For example, in *Commonwealth v. Baker*, 513 Pa. 23, 518 A.2d 802 (1986), which the Commonwealth finds "nearly identical" to this case, the defendant had made "many" sales of T.H.C. to the informant in the past, was seen possessing the drug between March 5th and March 12th, sold the drug to the informant under police surveillance on separate occasions, and told the informant he was expecting a "large quantity" of the drug on March 11th or 12th; a search warrant was executed on the 12th. In Schaeffer's case, however, excising the illegally monitored conversation from the warrant removes precisely that information which the court in *Baker* found most supportive of the magistrate's finding of probable cause: that is, that the defendant was expecting a delivery of drugs on the day before the search. *Cf. also Gray* (informant saw twenty pounds of marijuana in suspect's home within four days of warrant, then confirmed with suspect within two days of warrant that he still had marijuana); *Commonwealth v. Stamps*, 493 Pa. 530, 427 A.2d 141 (1981) (plurality opinion) (warrant executed within two weeks of observation of defendant preparing to sell thirteen "bundles" of heroin wasn't stale; affiant also monitored two short visits to subject premises on day before search); *Commonwealth v. Davis*, 331 Pa.Super. 285, 480 A.2d 1035 (1984) (combination of controlled buy, observation of more drugs on premises, defendant's record of drug arrests, and known addicts' visiting premises established probable cause for search). Perhaps the decision most helpful to the Commonwealth's position is *Commonwealth v. Toner*, 289 Pa. Super. 200, 433 A.2d 25 (1981) (2–1 decision), where this court held that a five-day-old tip alerting the police to the presence and use of marijuana on the premises, confirmed four days before the search by a police officer's detection of a strong odor of marijuana coming from the premises, sufficiently established probable cause for the search. However, even in *Toner* the five-day-old observation in-

volved a "large quantity" of marijuana, a factor totally absent from the affidavit used to justify the search of Schaeffer's quarters.

In a last-ditch effort to save the warrant, the Commonwealth also contends that we should infer that the informant orally reported the contents of Schaeffer's conversation to the police affiant, so that the information overheard through the electronic monitoring was not the only source from which the affiant knew that Schaeffer was expecting to have marijuana on the evening of April 5. However, if the trooper did learn of the expected shipment elsewhere than from the interception, he did not attest to this fact in the affidavit sworn to before the magistrate. If anything is settled in Pennsylvania's law of search and seizure, it is that probable cause for the issuance of a warrant must appear within the four corners of the supporting affidavit. *See Stamps*, 493 Pa. at 535–36, 427 A.2d at 143 (plurality opinion); *Commonwealth v. Simmons*, 450 Pa. 624, 626, 301 A.2d 819, 820 (1973); *Commonwealth v. Way*, 342 Pa.Super. 341, 346–47, 492 A.2d 1151, 1154 (1985) (Olszewski, J.); *Beauford*, 327 Pa.Super. at 269 n. 7, 475 A.2d at 791 n. 7; *Commonwealth v. Gannon*, 308 Pa.Super. 330, 341–42, 454 A.2d 561, 567 (1982); Pa.R.Crim.P. 2003(a)–(b). It would be sheer speculation for us to conclude, in the absence of a sworn written statement or indeed any statement at all to that effect, both that (1) the informant orally reported his conversation to the affiant and (2) the affiant relayed this fact to the magistrate. We therefore find that without the tainted fruits of the warrantless electronic surveillance, the police had no probable cause to search Schaeffer's home.

## III

■■ The final issue we must determine is whether the recently adopted "good faith" exception to the exclusionary rule would entitle the Commonwealth to admit the drugs seized during the unlawful search of Schaeffer's house. We conclude that the good-faith exception does not apply to

the seizure of drugs which was premised on the Commonwealth's warrantless interception of Schaeffer's conversation, and therefore order suppression of the evidence seized pursuant to the unlawful warrant.

In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that unreasonable searches and seizures under the fourth amendment would no longer be subject to the rule excluding the fruits of the illegal search or seizure where the police had acted in good-faith reliance on an apparently valid warrant later found not to establish probable cause. *See also Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). In *Commonwealth v. Melilli*, 361 Pa.Super. 429, 522 A.2d 1107 (1987), this court applied the "good faith" exception to a search found illegal under the Pennsylvania Constitution, and held that the Commonwealth could admit evidence seized pursuant to a warrant based in part on evidence obtained from pen registers installed without probable cause on the telephone lines of the defendants, a practice which, after the police had acted in *Melilli*, we found violative of the state constitutional prohibition on unreasonable searches and seizures in *Beauford*. The *Melilli* court recognized a state constitutional exception to the exclusionary rule "which has application narrowly to situations in which law enforcement officials have acted (1) in good faith; (2) in reasonable reliance upon a procedure expressly sanctioned by existing judicial decisions; and (3) pursuant to authorization obtained from a neutral magistrate." *Melilli*, 361 Pa.Superior Ct. at 440, 522 A.2d at 1112; *cf. Sell* (finding evidence subject to suppression under art. I, § 8 of Pennsylvania Constitution); *DeJohn* (same); *Tarbert* (same); *Commonwealth v. O'Shea*, 328 Pa.Super. 104, 117, 476 A.2d 911, 918 (1984) (dictum) (declining to find good faith exception to exclusionary rule under Pennsylvania Constitution), *allowance of appeal denied*, 328 Pa.Super. 104, 476 A.2d 911 (Pa.1985).

We believe, however, that the good-faith exception to the exclusionary rule announced in *Leon*, even if we were to

follow *Melilli* in adopting it as a matter of state constitutional law (an issue we do not decide), does not exempt the state from the exclusionary consequences of an illegal search and seizure where, as here, the police have acted on the basis of a statute which they interpreted to authorize a warrantless search and seizure without probable cause. The good faith exception cannot apply in such a situation because it is per se unreasonable for the police to believe that a statute confers upon them the authority to conduct searches and seizures in the homes of citizens on less than probable cause. As the Supreme Court explained in *Leon*,

> We have held, however, that the exclusionary rule requires suppression of evidence obtained in searches carried out pursuant to statutes, not yet declared unconstitutional, purporting to authorize searches and seizures without probable cause or search warrants. *See, e.g., Ybarra v. Illinois,* 444 U.S. 85, 62 L.Ed.2d 238, 100 S.Ct. 338 (1979); *Torres v. Puerto Rico,* 442 U.S. 465, 61 L.Ed.2d 1, 99 S.Ct. 2425 (1979); *Almeida-Sanchez v. United States,* 413 U.S. 266, 37 L.Ed.2d 596, 93 S.Ct. 2535 (1973); *Sibron v. New York,* 392 U.S. 40, 20 L.Ed.2d 917, 88 S.Ct. 1889, 44 Ohio Ops 2d 402 (1968); *Berger v. New York,* 388 U.S. 41, 18 L.Ed.2d 1040, 87 S.Ct. 1873 (1967). "Those decisions involved statutes which, by their own terms, authorized searches under circumstances which did not satisfy the traditional warrant and probable-cause requirements of the Fourth Amendment." *Michigan v. DeFillippo,* 443 U.S. 31, 39, 61 L.Ed.2d 343, 99 S.Ct. 2627 [2633] (1979). The substantive Fourth Amendment principles announced in those cases are fully consistent with our holding here.

468 U.S. at 912 n. 8, 104 S.Ct. at 3414–15 n. 8. We note also that the surveillance in this case was not "expressly sanctioned" by existing judicial decisions interpreting the Pennsylvania Constitution, because it occurred before the *Harvey* case first decided that question favorably to the Commonwealth's position.

The good faith exception on the federal level, moreover, apparently does not affect the "fruit of the poisonous tree" doctrine, i.e., the police cannot use unconstitutionally seized evidence to support a search warrant and then claim good faith reliance on the validity of that warrant. *See United States v. Karo*, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (fruits of illegal warrantless electronic surveillance had to be excised from search warrant in assessing probable cause) (decided two days before *Leon*).

Accordingly, regardless of whether a "good faith" exception to the exclusionary rule exists for unreasonable searches and seizures under the Pennsylvania Constitution, we find no grounds for applying it to the fruits of the body wire surveillance that occurred in this case.

We therefore reverse the judgment of sentence and remand for a new trial with all fruits of the illegal electronic surveillance suppressed.

OLSZEWSKI and KELLY, JJ., file concurring and dissenting opinions.

BECK, J., files a concurring and dissenting statement.

ROWLEY, J., files a dissenting statement.

OLSZEWSKI, Judge, concurring and dissenting:

I join in Part I of the majority's scholarly Opinion. I respectfully disagree, however, with the majority's conclusion in Part II that the affidavit was insufficient to establish probable cause for the search.

In my view, the warrant—as excised by the majority—satisfies the "totality of the circumstances" standard for probable cause as elucidated in *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985). Indeed, I would find the facts in the instant case virtually mirror those in *Commonwealth v. Baker*, 513 Pa. 23, 518 A.2d 802 (1986), a progeny of *Gray*. Speaking for the Court in upholding the validity of the warrant in *Baker*, Justice McDermott reasoned:

The warrant in this case was issued *on* March 12, 1981. The first sentence of the affiant's probable cause statement explicitly recites defendant's criminal conduct, to wit: "[B]etween the 5th and 12th of March, 1981, the actor did have in his possession a controlled substance containing T.H.C." Later it is alleged that "[T]he actor related further information to the informant ... that he was expecting a larger quantity of a substance containing T.H.C. on or about the 11th or 12th of March, 1981."

Thus, *the magistrate was presented with a clear indication that a crime was being, or had recently been, committed, i.e. the possession of a controlled substance.* In addition, he was also presented with reliable information that the commission of another crime was about to be, or had been, committed, i.e. the delivery of a larger quantity of a substance containing T.H.C.

*Baker*, 513 Pa. at 29, 518 A.2d at 805 (footnote omitted, first emphasis in original and second emphasis added).

As this language indicates, the *Baker* Court found that probable cause existed for two reasons: (1) the warrant was issued on the last date during which the defendant was in possession of a controlled substance; and (2) the defendant was expecting the delivery of a large quantity of drugs. I would not read *Baker* so narrowly as to require that an affiant must first learn of the delivery of a large quantity of a controlled substance before a warrant may be obtained. Although such information certainly would be helpful in establishing probable cause, *Gray* teaches us to look at all of the factors, not to focus on one particular factor or the lack thereof.

In this case, as in *Baker*, the warrant was issued on the last date in which Mr. Schaeffer was in possession of a controlled substance. Hence, "the magistrate was presented with a clear indication that a crime was being, or had recently been, committed." *Id.* Because I find this information sufficient to support a finding of probable cause, I would hold the warrant was properly issued.

KELLY, Judge, concurring and dissenting:

In this case, we are called upon to determine the conditions under which state law enforcement personnel in Pennsylvania may constitutionally conduct electronic participant monitoring.

I note initially that, as has frequently been the case in the past, this case arises as the result of a criminal's invocation of the state and federal constitutional proscriptions against unreasonable searches and seizures in an effort to suppress undeniable proof of his guilt. Nonetheless, it is a historical fact that many of the safeguards and liberties which honest citizens cherish and hold dear were forged in cases such as this involving common criminals; thus, we must keep in mind that our decisions defining the scope and limits of constitutional rights apply equally to the vast majority of law-abiding citizens as well as to those justly suspected and accused of crimes.

On the other hand, it must also be remembered that what the constitution forbids is not all searches and seizures, but *unreasonable* searches and seizures. Our learned colleague Judge McEwen has recently explained:

> Judicial examination of a challenge to a police search *requires the court to balance the competing needs of society.* On the one hand, the need of every society, including our free society, to provide for enforcement of its laws and thereby enable the preservation of the common weal is intrinsic to the existence of any society. That need in our society is, of course, described in constitutional parlance as the 'police power.' On the other hand, the quite decisive restrictions upon the 'police power' imposed by the founders and framers in the Bill of Rights bespeaks their keen awareness of the awesome nature of the 'police power'. The specific role of the courts then is to *balance the right of society to implement its police power against the right of a citizen to be free of police intrusion.* This challenging task requires the courts to balance those competing rights and then to discern: what is 'reasonable'—a term which, with its kin

'fairness' and 'due process', defies definition, but demands determination.

*Commonwealth v. Martinson*, 368 Pa.Super. 130, 140–141, 533 A.2d 750, 755 (1987) (per McEwen, J.; Cirillo, P.J., and Montemuro, J., join). (Emphasis added).

The eminent former Chief Justice Samuel Roberts explained the difficulty of this balancing approach as it applies to the right to privacy as follows:

A mere passing acquaintance with the daily newspaper suffices to substantiate the existence of a widely felt and insidious threat to individual privacy posed, not only by technological advances, but also by the evolution of contemporary social structures. A jealous regard for individual privacy is a judicial tradition of distinguished origin, buttressed in many area by the imperative mandate of constitutional guarantees. *Protection of individual privacy, however, appears frequently to reduce the methods available to law enforcement agencies in the detection and prosecution of crime. Few would deny that in this country today concern with the growth of criminal activity is of the same order of magnitude as the concern with the erosion of individual privacy.*

*Commonwealth v. McCoy*, 442 Pa. 234, 240–41, 275 A.2d 28, 31 (1971). (Emphasis added).

I would add that the tension between "the right to be let alone" and the proper exercise of "police power" arises as a necessary incident of "civil liberty." Society deprives the individual of the right to avenge himself by direct response and, in recompense for this loss, has instituted the "police power" to ensure a reasoned and just societal response. Chief Justice John Marshall explained, "[t]he very essence of civil liberty, is the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). Judge William Blackstone explained that:

every man, when he enters into society, gives up a part of his natural liberty, as the price of so valuable a purchase; and, in consideration of receiving the advantages of mutu-

al commerce, obliges himself to conform to those laws which the community has thought proper to establish. And this species of legal obedience and conformity is infinitely more desirable than that wild and savage liberty which is sacrificed to obtain it. For no man, that considers a moment, would wish to retain the absolute and uncontrolled power of doing whatever he pleases; the consequence of which is, that every other man would also have the same power, and then there would be no security to individuals in any of the enjoyments of life. Political, therefore, or civil liberty, which is that of a member of society, is no other than natural liberty, so far restrained by human laws (and no farther) as is necessary and expedient for the general advantage of the public. Hence, we may collect that *the law, which restrains a man from doing mischief to his fellow-citizens, though it diminishes the natural, increases the civil liberty of mankind.*

I *W. Blackstone, Commentaries,* *125–26 (Sharswood ed. 1872). (Emphasis added). The instant dispute, then, involves not merely the rights of the police and the rights of the individual; rather, it involves the conflict between the right of the societal majority to enforce its laws, and the rights of each individual member of society as against the rule of that majority.

The crux of appellant's appeal is that, notwithstanding the Commonwealth's compliance with the requirements of 18 Pa.C.S.A. § 5704(2)(ii), the state conducted an unreasonable search and seizure by using a police informant wired with a transmitter to allow the police to intercept and record a private conversation which occurred in appellant's home. Appellant contends that the interception of his private conversation violates both state and federal proscriptions against unreasonable searches and seizures. The main thrust of appellant's argument, however, is that this Court should adopt the minority view—adhered to in only Alaska, Montana, and Michigan (discussed *infra*)—that a warrant, issued by a judicial official and based upon proba-

ble cause, is constitutionally required under the state constitution prior to use of electronic participant monitoring by law enforcement personnel. Appellant urges a more expansive construction of the Pennsylvania proscription against unreasonable searches and seizures in this context than is currently given the Fourth Amendment by the United States Supreme Court.

In addition to the primary issue presented for review, the parties have framed two subsidiary issues which must also be addressed. First, assuming, *arguendo*, that all evidence derived from the electronic participant monitoring must be suppressed, did the affidavit in support of the April 6, 1984 search warrant contain other facts sufficient to establish probable cause and thereby obviate the necessity of declaring the warrant invalid? Second, assuming that the search warrant is invalid, should the fruits of the execution of the warrant nonetheless be deemed to have been admissible at trial under a "good faith" exception to a state constitutionally mandated exclusionary rule? [1]

The majority, per President Judge Cirillo, present an exhaustive analysis of the authorities which support the minority view that prior issuance by a judicial officer of a warrant based upon probable cause is constitutionally required under Pa. Const. Art. I, sec. 8 before law enforcement personnel may conduct electronic participant monitoring. The majority conclude that: evidence derived from warrantless electronic participant monitoring must be suppressed; the redacted affidavit contains insufficient averments to establish probable cause to support the search warrant; the search warrant is therefore invalid; and, a "good faith" exception to a state constitutionally mandated

---

1. Justice Louis Brandeis once opined that, "in frank expression of conflicting opinion lies the greatest promise of wisdom in governmental action...." *Gilbert v. Minnesota*, 254 U.S. 325, 338, 41 S.Ct. 125, 129, 65 L.Ed. 287 (1920). That being so, I believe it incumbent upon this Court to acknowledge the significant contributions which the thorough and thoughtful analysis of counsel for appellant and counsel for the Commonwealth have made to our deliberations on these important matters. Both sides have presented eloquent and persuasive arguments for their particular points of view.

230

exclusionary rule cannot apply because it is *per se* unreasonable for the police to have believed that 18 Pa.C.S.A. § 5704 conferred upon them authority to conduct searches on less than probable cause. Majority Opinion, *supra,* 370 Pa.Super. at 221–222, 536 A.2d at 375. The majority reverse and remand for a new trial.

Judge Rowley, in his dissent, concludes that the electronic participant monitoring conducted in the instant case was constitutional under both the Pennsylvania and the United States Constitutions. Judge Rowley relies upon the reasoning expressed in *Commonwealth v. Harvey,* 348 Pa.Super. 544, 502 A.2d 679 (1985), wherein this Court embraced the view of the United States Supreme Court and an overwhelming majority of our sister states—that warrantless electronic participant monitoring violates no reasonable expectation of privacy, and therefore, does not trigger the protections of either the Fourth Amendment or the analogous provisions of state constitutions.[2] Judge Rowley

2. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *Evers v. State,* 434 So.2d 804 (Ala.Crim.App.1982); *State v. Paul,* 146 Ariz. 86, 703 P.2d 1235 (1985); *Hoback v. State,* 286 Ark. 153, 689 S.W.2d 569 (1985); *People v. Phillips,* 41 Cal.3d 29, 222 Cal.Rptr. 127, 711 P.2d 423 (1985); *People v. Moreley,* 725 P.2d 510 (Colo.1986); *State v. Del Vecchio,* 191 Conn. 412, 464 A.2d 813 (1983); *United States v. Sell,* 487 A.2d 225 (D.C.App.1985); *State v. Pulgini,* 366 A.2d 1198 (Del.Super.1976); *State v. Ridenour,* 453 So.2d 193 (Fla.App.1984); *Green v. State,* 250 Ga. 610, 299 S.E.2d 544 (1983); *State v. Lee,* 67 Haw. 307, 686 P.2d 816 (1984); *State v. Couch,* 103 Idaho 205, 646 P.2d 447 (1982); *Lawhorn v. State,* 452 N.E.2d 915 (Ind.1983); *State v. Roudybush,* 235 Kan. 834, 686 P.2d 100 (1984); *State v. Reeves,* 427 So.2d 403 (La.1982); *State v. Thomas,* 432 A.2d 757 (Me.1981); *Buzbee v. State,* 58 Md.App. 599, 473 A.2d 1315 (1984); *Commonwealth v. Thorpe,* 384 Mass. 271, 424 N.E.2d 250 (1981); *State v. Olkon,* 299 N.W.2d 89 (Minn.1980); *Everett v. State,* 248 So.2d 439 (Miss.1971); *State v. Engleman,* 634 S.W.2d 466 (Mo.1982); *State v. Manchester,* 220 Neb. 41, 367 N.W.2d 733 (1985); *State v. Kilgus,* 128 N.H. 577, 519 A.2d 231 (1986); *State v. Parisi,* 181 N.J.Super. 117, 436 A.2d 948 (1981); *State v. Hogervorst,* 90 N.M. 580, 566 P.2d 828 (1977); *People v. Lasher,* 58 N.Y.2d 962, 460 N.Y.S.2d 522, 447 N.E.2d 70 (1983); *State v. Detter,* 298 N.C. 604, 260 S.E.2d 567 (1979); *State v. Geraldo,* 68 Ohio St.2d 120, 22 Ohio Op.3d 366, 429 N.E.2d 141 (1981); *Ferguson v. State,* 644 P.2d 121 (Okla.Crim.1982); *State v. Underwood,* 293 Or. 389, 648 P.2d 847 (1982); *State v. Ahmadjian,* 438 A.2d 1070 (R.I.1981); *State v. Iverson,* 364 N.W.2d 518 (S.D.1985); *State v. Lee,* 618 S.W.2d 320 (Tenn.Cr.App.1981); *Kizziar v. State,* 628 S.W.2d 243

opines further that the limitations of 18 Pa.C.S.A. §§ 5704 and 5714, "are sufficient to guard against the unlimited and indiscriminate use of such interceptions and the evidence obtained therefrom and act as an adequate deterrent to inappropriate police activity." Dissenting Opinion, per Rowley, J., *infra*, 370 Pa.Super. at 271, 536 A.2d at 400. Although Judge Rowley finds the electronic participant monitoring to have been constitutional, he also indicates his agreement with Judges Olszewski and Beck that the affidavit contains sufficient facts to establish probable cause even with the averments based upon the affiant's participation in the electronic participant monitoring redacted. He offers no opinion as to the admissibility of the fruits of the execution of the search warrant under a "good faith" exception to a state constitutionally mandated exclusionary rule.

I can agree fully with neither the majority nor the dissent. I agree with the majority that unbridled use of electronic participant monitoring involves a threat to the reasonable expectations of privacy of law-abiding citizens and therefore constitutes a search and seizure triggering the protections of Pa. Const. Art. I, sec. 8. I also agree that 18 Pa.C.S.A. §§ 5704 and 5714 are insufficient to safeguard the legitimate privacy interests threatened. While I share Judge Rowley's confidence that those designated to authorize warrantless electronic participant monitoring will not countenance wholesale abuses of the procedure so as to bring into existence the Orwellian, apocalyptic vision so eloquently decried in the majority opinion, I must note the distinct possibility, even probability, that under the current standardless system and in the heat of passions arising in particular cases, zealousness for the *perceived* public good may overpower the judgment and objectivity of even the most faithful and conscientious members of the Commonwealth's prosecuting team. The current safe-

(Tex.Crim.App.1982); *State v. Erickson,* 722 P.2d 756 (Utah 1986); *Cogdill v. Commonwealth,* 219 Va. 272, 247 S.E.2d 392 (1978); *State v. Caliguri,* 99 Wash.2d 501, 664 P.2d 466 (1983); *Blackburn v. State,* 290 S.E.2d 22 (W.Va.1982); *Jackson v. State,* 624 P.2d 751 (Wyo.1981).

guards leave *virtually unrestricted discretion* in the hands of the members of the prosecution team as to who will be subjected to such surveillance, for what reasons, under what conditions, and for how long. Consequently, I agree with the majority that additional safeguards are required.

However, while I share the majority's grave concerns and cautious sentiments regarding the potential for abuse of electronic surveillance technology in general, and electronic participant monitoring in particular, I do not agree with the majority's conclusion that prior issuance by a judicial officer of a warrant based upon probable cause is an irreducible prerequisite to the constitutional use of electronic participant monitoring by state law enforcement personnel in Pennsylvania. Nor do I agree that our constitution has already balanced "the needs of law enforcement against the rights of citizens." *See* Majority Opinion, *supra*, 370 Pa.Super. at 205, 536 A.2d at 367. Rather, I believe that the Constitution requires us to conduct additional analysis in order to determine whether the seizure of appellant's private conversation by use of electronic participant monitoring was *unreasonable*. Nonetheless, I agree that, *because the safeguards were constitutionally inadequate*, the seizure of appellant's private communications was unreasonable. I outline, *infra*, the type of basic safeguards I believe to be minimally required in order to find the warrantless use of electronic participant monitoring by law enforcement personnel to be reasonable.

Assuming, *arguendo*, that the tapes of the monitoring and the monitoring officer's statements should have been suppressed pursuant to a state constitutionally mandated exclusionary rule (the existence and scope of which remains an open question), I would find the redacted affidavit of probable cause to contain insufficient averments to establish probable cause for the search of a home, and therefore, would find the search warrant to be invalid. In this I agree with the majority and not Judge Olszewski's concurring and dissenting opinion with which Judges Rowley and Beck have indicated agreement. However, for a variety of rea-

sons, discussed *infra*, I find that suppression of the fruits of the execution of the search warrant in this case is neither required nor appropriate, and would decline to do so. Finally, I note that because neither the tapes of the prior warrantless electronic participant surveillance nor testimony of the monitoring officers were admitted into evidence during appellant's bench trial, I find the failure to suppress that evidence, if error, was nonetheless harmless beyond a reasonable doubt, and would affirm judgment of sentence. Because of the importance of the issues raised, I write separately to explain my reasoning and to express my concerns regarding the approaches taken by the majority, concurring, and dissenting opinions.

## I.

Under acts of Congress and state legislatures, it is unlawful to intercept a private oral or wire communication or to use or divulge the contents of an intercepted communication unless the interception, use, or divulgence is pursuant to prior judicial authorization, or unless a party to the conversation has consented to the interception by law enforcement personnel investigating suspected criminal activity.[3] Appellant concedes that the electronic participant monitoring conducted in the instant case did not violate Pennsylvania's Wiretapping and Electronic Surveillance Act. (Appellant's Brief at 11–13). Appellant contends, however, that to the

**3.** *See* 18 U.S.C. §§ 2510–2520; 18 Pa.C.S.A. §§ 5701 *et seq.; see also* Carr, *Law of Electronic Surveillance*, § 3.5 "Surveillance with Consent of a Party to the Conversation," at 3–55 to 3–76 (2nd Ed.1987) (collecting statutes and cases); Fishman, *Wiretapping and Eavesdropping*, Ch. 2, § 8 at 56–74 (1978 & Cumm.Supp.1986) (same); Carr, *Electronic Surveillance by Consent Under State Law*, 11 Search & Seizure L.Rep. 77, 79–82 (1984) (same); Annotation, *Permissible Warrantless Surveillance Under State Communications Statute, By Local Law Enforcement Officer or One Acting in Concert with Officer*, 27 ALR 4th 449 (1984 & 1987 Supp.); Annotation, *Admissibility in Criminal Prosecution of Evidence Secured by Mechanical or Electronic Eavesdropping Device*, 97 ALR2d 1283 (1964), 96–100 ALR2d Supp. 269 (1983 & 1987 Supp.); Search and Seizure § 31, 68 Am.Jur.2d 685 (1973 & 1987 Cum.Supp.) ("Informers Use of Concealed Listening Device"); Telecommunications § 217, 74 Am.Jur.2d 538 (1974 & 1987 Cum.Supp.) ("Consent of One Party to Communication that Another May Hear").

extent that 18 Pa.C.S.A. § 5704 *authorizes* electronic participant monitoring without requiring prior issuance by a judicial official of a warrant based upon probable cause, the statute is unconstitutional. (Appellant's Brief at 11).

I agree with the majority; 18 Pa.C.S.A. § 5704 does not *authorize* electronic participant monitoring. Rather, the statute merely exempts specified types of electronic participant monitoring from the *statutory* restrictions and limitations placed upon non-exempt wiretapping and electronic surveillance procedures. The statute provides in pertinent part, "[i]t shall not be unlawful *under this chapter* for...." (Emphasis added). Thus, while 18 Pa.C.S.A. § 5704(2) clearly establishes the absence of a *statutory* bar to the electronic participant monitoring conducted in the instant case, the statute provides no authorization for such procedures and does not in any way insulate electronic participant monitoring conducted in compliance with 18 Pa.C.S.A. § 5704(2) from constitutional scrutiny.

## II.

Under the current construction of the Fourth Amendment by the United States Supreme Court, warrantless electronic participant monitoring by law enforcement personnel does not constitute a search or seizure because the monitoring is deemed not to have invaded a reasonable expectation of privacy. *See United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *United States v. Caceres*, *supra* 440 U.S. at n. 3, 99 S.Ct. at n. 3; *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality); *Kaufer v. United States*, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969) (*per curiam*), *aff'g* 406 F.2d 550 (2nd Cir.1969).[4] Based upon the foregoing authorities, I

---

**4.** *See also Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Osborn v. United States,* 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Rathbun v. United States,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957); *On Lee v. United States,* 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); *United States v. Kelly,* 708

agree with the majority's conclusion that, "the Fourth Amendment warrant requirement applies to electronic eavesdropping conducted by the police without the consent of either party to the conversation, but does not apply where one of the parties to the conversation consents." Majority Opinion, *supra*, 370 Pa.Super. at 188, 536 A.2d at 358. (Citations omitted).

## III.

Appellant's primary contention, though, is that the electronic participant monitoring violated the proscriptions against unreasonable searches and seizures in Article I, Section 8 of the Pennsylvania Constitution. Appellant argues that the search and seizure provision of the Pennsylvania Constitution must be construed so as to provide greater protections against electronic participant monitoring than the Fourth Amendment. The majority embrace this contention; Judge Rowley rejects it. My analysis leaves me between these two positions.

## A.

As the majority notes, the Pennsylvania proscription against unreasonable searches and seizures antedates the federal provision. Majority Opinion, *supra*, 370 Pa.Super. at 194, 536 A.2d at 361. Indeed, each of the guarantees contained in the federal Bill of Rights had its antecedents in one or more of the state constitutions and colonial charters. *See generally* S. Fisher, *The Evolution of the Constitution of the United States* (Philadelphia 1897). "Far from being the model for the states, the federal Bill of Rights was added to meet demands for the same guarantees against the new central government the people had secured against their own local officials." Linde, *First Things First, Redis-*

F.2d 121 (3rd Cir.), *cert. denied* 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 258 (1983); *United States v. Santillo*, 507 F.2d 629 (3rd Cir.), *cert. denied sub nom. Buchert v. United States*, 421 U.S. 968, 95 S.Ct. 1960, 44 L.Ed.2d 457 (1975); *see also* Annotation, *Obtaining Evidence By Use Of Sound Recording or of Mechanical or Electronic Eavesdropping Device—("Bugging") as Violation of Fourth Amendment—Federal Cases*, 59 L.Ed.2d 959 (1979 & 1986 Supp.).

*covering the State's Bill of Rights,* 9 U.Balt.L.Rev. 379, 381 (1980). Eight of the thirteen original states adopted a state constitutional prohibition against unreasonable searches and seizures prior to the adoption of the Fourth Amendment. *See* Cuddihy, "Fourth Amendment (Historical Origins)," in 2 *Encyclopedia of the American Constitution* 762 (Levy ed. 1987); *see also* S. Fisher, *supra* at 199–201. Moreover, it is appropriate to note that from 1776 until 1949 when the Fourth Amendment was first applied to the states via the Fourteenth Amendment, the proscription against unreasonable searches and seizures in the Pennsylvania Constitution, and not the Fourth Amendment, protected Pennsylvanians from unreasonable searches and seizures by state law enforcement personnel. *Commonwealth v. Bruno,* 203 Pa.Super. 541, 201 A.2d 434 (1964); *Commonwealth v. Rubin,* 82 Pa.Super. 315, 319 (1923); *accord* Woodside, *Pennsylvania Constitutional Law,* at 116 (1985).

Clearly, Pa.Const. Art. I, sec. 8 has identity and vitality separate and distinct from that of the Fourth Amendment; it remains therefore emphatically the province and duty of the Pennsylvania judiciary to declare its scope and limitations. *See Commonwealth v. DeJohn, supra,* 486 Pa. at 44, 403 A.2d at 1289; Beck, *Pennsylvania Supreme Court Review—1982,* 56 Temple Law Quarterly 705, 708–10 (1983); Roberts, *The Supreme Court of Pennsylvania: Constitutional Government in Action,* 54 Temple Law Quarterly 403, 411 (1981); *see also* Brennen, *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights,* 61 N.Y.U.L.Rev. 535 (1986); Galie, *The Other Supreme Courts: Judicial Activism Among State Supreme Courts,* 33 Syracuse L.Rev. 731 (1982).

However, even proponents of "new federalism" recognize that the case for an independent role for state courts "should not be read as a case for unthinking activism. No judge, state or federal, is a knight errant whose only concern is to do good. Hence, the state judge, when

presented with the invitation to develop a body of state constitutional law, should pause to consider some of the dangers along the way." Howard, *State Courts and Constitutional Rights in the Day of the Burger County*, 62 Va.L.Rev. 873, 940–41 (1976) (also coining the phrase "new-federalism" to describe the use of state sovereignty to insulate state constitution protections broader than the federal constitutional protections from review in the federal courts); *cf.* Berger, *New Theories of Interpretation: The Activists' Flight from the Constitution*, 47 Ohio St.L.J. 1 (Winter 1986) (analyzing and critizing the activist approaches).

As the majority recognizes, we are "expected to deal carefully with a Supreme Court opinion and to explain forthrightly why [we find ourselves] required to reason differently." Majority Opinion, *supra*, 370 Pa.Super. at 190, 536 A.2d at 359, *quoting Commonwealth v. DeJohn, supra*, 486 Pa. at 44, 403 A.2d at 1289. Moreover, it should be noted that the recognition of a higher standard for searches and seizures under state constitutional law than that required under federal constitutional law in one set of circumstances, does not require that a higher standard should be imposed in all other circumstances. In *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985), our Supreme Court explained, "[w]hile we can interpret our own constitution to afford defendants greater protections than the federal constitution does, *see e.g., Commonwealth v. Sell*, 504 Pa. 46, 63–64, 470 A.2d 457, 467 (1967) (collecting cases), *there should be a compelling reason to do so.*" 509 Pa. at 484–85, 503 A.2d at 926. (Emphasis added).

### B.

Pennsylvanians undoubtedly have the right to adopt a state constitution which provides greater limitations on the warrantless use of electronic participant monitoring by law enforcement personnel than the federal constitution provides. The question in the instant case, however, is not

whether Pennsylvanians may, but whether we have already done so.

The mere fact that Pa.Const. Art. I, sec. 8 antedates the Fourth Amendment does not provide a reason to construe it differently than the Fourth Amendment. Both were directed toward eliminating the same evils—general warrants and writs of assistance. *See Wakely v. Hart*, 6 Binn. 316, 317–18 (1814); [5] *Commonwealth v. Rubin, supra*, 82 Pa.Super. at 319–20; *see also* V *The Founder's Constitution* 219, 219–44 (1984) (tracing the origins of the Fourth Amendment); Galloway, *Fourth Amendment Ban on General Searches and Seizures*, 10 Search and Seizure L.Rep. 141, 141–48 (1983); Marke, "The Writs of Assistance Case and the Fourth Amendment," in *Essays in Legal History in Honor of Felix Frankfurter*, at 351–72 (Forkosch ed. 1966); White, *Commentaries on the Constitution of Pennsylvania*, at 157–59 (Philadelphia 1907).

Moreover, there are no significant textual differences which would provide a reason for differing construction of the clauses. *Commonwealth v. Gray, supra*, 509 Pa. at 485–86, 503 A.2d at 926; *see also Commonwealth v. John-*

5. In *Wakley v. Hart, supra*, Chief Justice Tilghman explained:

[T]he plaintiff insists, that by the constitution of this state, *no arrest is lawful without a warrant, issued on probable cause supported by oath.* [ . . . ] The provisions of Article IX, sec 7 [predecessor to Art. I, sec. 8], so far as concern warrants, only guard against their abuse by issuing them without good cause, or in so general or vague a form, as may put in the power of the officers who execute them to harass innocent persons under the pretense of suspicion; for if general warrants are allowed, it must be left to the officer, on what person or things they are to be executed. But it is·nowhere said, that there should be no arrest without warrant. To have said so would have endangered the safety of society.

\* \* \* \* \* \*

The whole section indeed was nothing more than an affirmance of the common law, for general warrants have been decided to be illegal; but as the practice of issuing them had been ancient, the abuses great and the decisions against them only of modern date, the agitation occasioned by the discussion of this important question had scarcely subsided, and it was thought prudent to enter a *solemn veto* against this powerful engine of despotism.

6 Binn. at 317–18 (emphasis in original); *see also Commonwealth v. Ryan*, 21 Pa.D. & C. 457, 458 (1934); *Commonwealth v. Street*, 3 Pa.D. & C. 783, 787–88 (1923).

*ston,* 515 Pa. 454, 472, 530 A.2d 74, 83 (1987) (Hutchinson, J., concurring); *Commonwealth v. Platou,* 455 Pa. 258, 266 n. 11, 312 A.2d 29, 34 n. 11 (1973), *cert. denied* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *compare* U.S. Const. Amend. 4 *and* Pa.Const. Art. I, sec. 8.[6] Indeed, the revision of the Pennsylvania Constitution of 1776 in 1790 *significantly reduced textual differences* which might otherwise have supported a broader construction of the Pennsylvania provision than the federal provision.[7] It is significant that these changes were made unanimously and contemporaneously with the ratification of the Fourth Amendment by Pennsylvania.[8] The situation in Pennsylvania is, in this

6. **U.S. Const.Amend. IV**
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 **Pa. Const. Article I, § 8**
 The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or thing shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

7. **Pa. Const. (1776) Dec. of Rts., Cl. X**
 Tenth. That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure, and therefore warrants without oaths or affirmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his or their property, not particularly described are contrary to that right, and ought not to be granted.
 **Pa. Const. (1790), Article IX., sec. 8**
 Sec. 8. That the people shall be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures; and that no warrant to search any place, or to seize any person or things shall issue, without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation.

8. James Madison included a provision which eventually became the Fourth Amendment in the proposed Bill of Rights he submitted to the United States Congress on June 8, 1789. The proposal was approved as amended on August 17, 1789. The Fourth Amendment was transmitted to the states for ratification by President Washington on September 25, 1789.

240

respect, quite different from the situation faced by the courts in Alaska, Montana, Louisiana, Florida, and Hawaii, to whose decisions the majority look for guidance and support. Majority Opinion, 370 Pa.Super. at 191, 536 A.2d at 360.

### C.

*State v. Glass*, 583 P.2d 872 (Alaska 1978), cited by the majority, did not involve the interpretation of a state constitutional provision analogous to the Fourth Amendment. 583 P.2d at 875. Rather, the Alaska Supreme Court expressly based its holding—that a warrant was required prior to the use of electronic participant monitoring by law enforcement personnel—upon Alaska Const. Art. I, sec. 22 which provides: "[t]he right of the people to privacy is

On December 10, 1789, the Pennsylvania Constitutional Convention unanimously "Resolved, That, that part of the constitution of this commonwealth, called a declaration of the rights of the inhabitants of the commonwealth or state of Pennsylvania, requires alterations and amendments, in such a manner as that the rights of the people, reserved, and excepted out of the general powers of government, may be more accurately defined and secured, and that the same an such other alterations and amendments in said constitution as may be agreed on, be made to correspond with each other." On December 11, 1789, a committee consisting of Delegates Findley, Hand, Miller, Wilson, Irvine, Lewis, Ross, Smith and Addison, were elected to report a draft of a proposed constitution to the Convention. On December 21, 1789 a draft was reported which contained Article IX, sec. 8 in the form finally adopted. This proposal was considered and approved unanimously on February 23, 1790. A semicolon was substituted for a comma between the words "seizure" and "and" on February 26, 1790.

The Fourth Amendment was ratified by Act of the Pennsylvania Legislature on March 10, 1790. *See* 2 Smith's Laws 516 (1810). On August 17, 1790, Art. IX, sec. 8 was again considered by the Convention and approved without revision. On September 2, 1790, the new Pennsylvania Constitution was ratified as a whole and proclaimed. The Bill of Rights, including the Fourth Amendment, was finally adopted on December 15, 1791. *See Proceedings Relative to Calling the Conventions of 1776 and 1790, The Minutes of the Convention that Formed the Present Constitution of Pennsylvania, Together with the Charter to William Penn, the Constitutions of 1776 and 1790, and A View of the Proceedings of the Convention of 1776, and the Council of Censors, passim* (Harrisburg 1825); Cuddihy, *supra*, at 762; W. Hickey, *The Constitution of the United States of America,* at 33–36 (Philadelphia 1854).

recognized and shall not be infringed." 583 A.2d at 874.[9] In rejecting the state's arguments based upon *United States v. White, supra,* and earlier federal cases, the Alaska Supreme Court stated, "those authorities should not be regarded as determinative of the scope of Alaska's right to privacy amendment, since no such express right is contained in the U.S. Constitution." 583 A.2d at 875.

Likewise, *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216 (1978), also cited by the majority, expressly based its holding—that a warrant was required prior to the use of electronic participant monitoring by law enforcement personnel—upon Mont.Const. Art. II, sec. 10, which provides, "[t]he right to privacy is essential to the well being of a free society and shall not be infringed without a showing of a compelling state interest." 582 P.2d at 1220.[10] Indeed, the Montana Supreme Court has stated that where state and federal constitutional provisions are identical or nearly iden-

**9.** In subsequent cases, the Alaska Courts have held that: the ruling in *Glass* is to be applied only to interceptions made after the date of the *Glass* decision, *Mossberg v. State,* 624 P.2d 796, 800–01 (Alaska 1981); a warrant authorizing interception need not specify the place where the interception is to occur, and service of the warrant need not occur until after the interception, *Jones v. State,* 646 P.2d 243, 247–49 (Alaska App.1982); the warrant requirement does not apply to discussions with a uniformed police officer, *Juneau v. Quinto,* 684 P.2d 127 (Alaska 1984), *rev'g* 664 P.2d 630 (Alaska App.1983); and, warrantless recordings are, despite *Glass,* admissible in perjury prosecutions, *Wortham v. State,* 666 P.2d 1042 (Alaska 1983).

**10.** In subsequent cases, Montana Courts have held: a warrant is only required for "face to face" electronic participant monitoring, consensual interception of telephone conversations does not violate Article II, sec. 10, *State v. Coleman,* 189 Mont. 492, 616 P.2d 1090 (1980) and *State v. Cannon,* 687 P.2d 705 (Mont.1984); failure to obtain a warrant only invalidates the recordings and the monitoring officer's testimony, the participant may still testify, *State v. Jackson,* 180 Mont. 195, 589 P.2d 1009 (1979); likewise, evidence acquired or derived as a result of the illegally monitored meeting is not tainted, *State v. Hanley,* 186 Mont. 410, 608 P.2d 104 (1980) and *State v. Bassett,* 189 Mont. 28, 614 P.2d 1054 (1980); and, a search warrant authorizing electronic participant monitoring may be issued based upon informant supplied information, may authorize monitoring of informant and target for ten days, and need not specify location where monitoring will occur (designation of informant, target, and duration of authorization sufficiently describes communications to be seized), *State v. Coleman, supra.*

tical, the state provisions will be construed consistently with United States Supreme Court decisions construing the federal provisions. *See State v. Jackson*, 206 Mont. 338, 672 P.2d 255 (1983); *State v. Finley*, 173 Mont. 162, 566 P.2d 1119 (1977). Thus, in absence of the express right to privacy in Mont.Const. Art. II, sec. 10, the provisions of Mont.Const. Art. II, sec. 11 (analogous to Pa. Const. Art. I, sec. 8 and the Fourth Amendment) would provide no greater protection against electronic participant monitoring by law enforcement personnel than the Fourth Amendment. *See* Collins, *The Emergence of State Constitutional Law: Reliance on State Constitutions—The Montana Disaster*, 63 Tex.L.Rev. 1095 (1985) (analyzing and criticizing *Jackson* and *Finley* ).

Similarly, the original 6–1 decision in *State v. Reeves*, 427 So.2d 403 (La.1982), noted by the majority, was expressly based upon *significant textual differences* between La. Const. Art. I, sec. 5 and the Fourth Amendment.[11] The original majority (which became the minority on rehearing) explained:

> By its clear terms the constitution expressly protects every person's 'communications' from unreasonable searches, seizures and 'invasions of privacy,' thereby affirmatively establishing a right to privacy including a person's communications. The safeguard is unlimited and thus covers all of a person's private communications. Because the constitution expressly elevates communication as a protected interest to a position of equal stature with other expressly protected interests, invasions or interceptions of them may not be conducted without a

**11.** Article I, § 5 of the 1974 Louisiana Constitution provides:
Every person shall be secure in his person, property, *communications,* houses, papers, and effects against unreasonable searches and seizures, or *invasions of privacy.* No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, *and the lawful purpose or reason for the search.* Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
(Emphasis added).

warrant issued upon probable cause, particularly describing the communication to be invaded, and the lawful purpose or reason for the interception.

427 So.2d at 404–05. The original majority rejected the rationale of *United States v. White, supra,* reasoning that, "[t]he Fourth Amendment does not contain these explicit guarantees and, as interpreted by the *White* plurality, simply does not address some types of invasions of privacy that concerned the delegates and the people of this State in adopting the 1974 Louisiana Constitution." 427 So.2d at 409.

On rehearing, the new majority held that the defendants' conversations were "communications" but that no "invasion of privacy" had occurred. While applying Justice Harlan's actual and reasonable expectation of privacy test, the court expressly rejected Justice Harlan's *anecdotal* argument that electronic participant monitoring will have a "chilling effect" on free speech, *White, supra,* 401 U.S. at 787–89; the rehearing majority responded to this argument:

> Those who oppose warrantless consensual surveillance argue that it will have a chilling effect on free and open discourse among members of society. This claim is speculative at best. [...] The fact that this type of surveillance exists in the federal system or existed in our jurisdiction has not frustrated society's willingness to trust others. Free and open discourse has not been inhibited.

427 So.2d at 418. (Footnote omitted). Louisiana has since reaffirmed the holding of the rehearing majority. *See State v. Terracina,* 430 So.2d 64 (La.1983) (per Lobrano, with two judges joining, three judges concurring and one dissenting); *State v. Marks,* 503 So.2d 32 (La.App.1986); *State v. Taylor,* 483 So.2d 232 (La.App.1986); *see also* Wise, *State v. Reeves: Interpreting Louisiana's Right to Privacy,* 44 La.L.Rev. 183 (1983).

The majority also cites *State v. Lee,* 67 Hawaii 307, 686 P.2d 816 (1984), and *State v. Lester,* 64 Hawaii 659, 649 P.2d 346 (1982); however, neither of these cases support the

argument that a warrant based on probable cause is constitutionally required prior to use of electronic participant surveillance by law enforcement personnel. Indeed, despite an express constitutional proscription against "invasion[s] of privacy," in Hawaii Const. Art. I, sec. 7, the Hawaii Supreme Court has consistently held that the Hawaii Constitution provides no greater protection against warrantless electronic participant monitoring than the Fourth Amendment. *State v. Lee, supra,* 686 P.2d at 817–18; *State v. Okubo,* 67 Hawaii 197, 682 P.2d 79, 81 (1984); *State v. Pilago,* 65 Hawaii 22, 24, 649 P.2d 363, 365 (1982); *State v. Lester, supra,* 649 P.2d at 352.

The majority also cites *State v. Sarmiento,* 397 So.2d 643 (Fla.1981), *aff'g* 371 So.2d 1047 (Fla.App.1979), wherein the Florida Supreme Court held that, in absence of exigent circumstances, warrantless electronic participant monitoring of private conversations *in a target's own home* violated the *express proscription* against "unreasonable interceptions of private communications" in Florida Const. Art. I, sec. 12.[12] Again, *significant textual differences* account for the difference in the construction of the state and federal provisions.

The fate of the *Sarmiento* rule, however, is particularly instructive as to the risks and limitations of the activist approach to "new federalism." Following the *Sarmiento* decision, an active crusade was launched in the Florida Legislature which resulted in the passage of the following

12. *Sarmiento, supra,* was applied to cases pending on appeal, but not to cases finally decided prior to the filing of the *Sarmiento* decision. *See Williams v. State,* 421 So.2d 512 (Fla.1982); *Hoberman v. State,* 400 So.2d 758 (Fla.1981). The rule announced in *Sarmiento* was narrowly confined to "face to face" electronic participant monitoring in the *target's home. See State v. Williams,* 443 So.2d 952, 955 (Fla.1983) (legality of monitoring of phone call to target's home upheld, distinguishing *Sarmiento* ); *State v. Chiarenza,* 406 So.2d 66 (Fla.App.1981) (legality of monitoring in informant's home upheld, distinguishing *Sarmiento* ); *Morningstar v. State,* 405 So.2d 778 (Fla. App.1981) (legality of monitoring at target's place of business upheld, distinguishing *Sarmiento* ); *Padgett v. State,* 404 So.2d 151 (Fla.App. 1981) (same).

constitutional amendment in place of the provision construed in *Sarmiento:*

§ 12. Searches and Seizures

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and against the unreasonable interception of private communications by any means, shall not be violated. No warrant shall be issued except upon probable cause, supported by affidavit, particularly describing the place or places to be searched, the person or persons, thing or things to be seized, the communication to be intercepted, and the nature of evidence to be obtained. *This right shall be construed in conformity with the 4th Amendment to the United States Constitution, as interpreted by the United States Supreme Court. Articles or information obtained in violation of this right shall not be admissible in evidence if such articles or information would be inadmissible under decisions of the United States Supreme Court construing the 4th Amendment to the United States Constitution.*

Fla. Const. Art. 1, sec. 12 (as amended November 2, 1982) (emphasis indicates text added to the former provision). The new provision has been construed to have the effect of overruling *Sarmiento* prospectively, and to have brought Florida back into line with the majority view as to the constitutionality of warrantless electronic participant monitoring by law enforcement personnel. *Madsen v. State,* 502 So.2d 948 (Fla.App.1987); *State v. Hume,* 463 So.2d 499 (Fla.App.1985); *State v. Ridenour,* 453 So.2d 193 (Fla.App. 1984); *see also* Wilks, "The New Federalism in Criminal Procedure: Death of the Phoenix?," in *Developments in State Constitutional Law* at 166–193 (Nat'l Center for State Courts 1986) (discussing popular repeal of "new federalism" decisions by state constitutional amendments, including *Sarmiento* ).[13]

**13.** Pennsylvania has had similar experience with popular repeal of unpopular state constitutional decisions by state constitutional amendment. *See* Pa. Const. Art. I, sec. 9 (as amended November 6, 1984, in response to *Commonwealth v. Triplett,* 462 Pa. 244, 341 A.2d

Based upon the foregoing, I find any reliance by the majority upon *Glass, Brackmun, Reeves, Lester, Lee,* and *Sarmiento* to be misplaced. Each of those cases involved the interpretation of a recently adopted state constitutional amendment expressly providing a constitutional right to privacy above and beyond that afforded by the state constitution's provision analogous to the Fourth Amendment; Pennsylvania's constitution contains no such amendment.[14]

62 (1975) (holding confession obtained as the result of a violation of *Miranda* rights could not be used to impeach an accused's denial of guilt at trial)); *Commonwealth v. Baxter,* 367 Pa.Super. 342, 532 A.2d 1177 (1987) (analyzing effects of the 1984 amendment to Pa. Const. Art. I, sec. 9).

**14.** Indeed, our most recent Constitutional Convention in 1968 was *by design* powerless to alter the provisions of our Declaration of Rights. *See* Act of March 15, 1967, No. 2, P.L. 2 ("Providing for a constitutional convention with limited powers"). *See also* 2 Daily Journal 15 (December 5, 1967), *reprinted in* I *Debates of the Pennsylvania Constitutional Convention of 1967-1968* (Harrisburg 1969) (remarks of former Governor John S. Fine, noting the prohibition against revision of our Declaration of Rights). Thus, while the conventions in Alaska, Montana, Louisiana, Hawaii and Florida had been authorized and encouraged to alter and expand their state's Bills of Rights, our convention was purposefully denied the power to do so.

I note that the historical reluctance of Pennsylvanians to alter the provisions of the Declaration of Rights adopted in 1790 alluded to in *Commonwealth v. Sell, supra,* 504 Pa. at 62-63, 470 A.2d at 466, is eloquently explained by the following remarks of Delegate Daniel Kaine to the Constitutional Convention of 1872-73:

The Bill of Rights, as we have it, was framed in 1790. It passed through the Convention of 1837-38 without the alteration of a single word, without the crossing of a t or the dotting of an i. We have had it as it came from the hands of the Convention in this city, signed as it was, and proclaimed here on the second day of September, 1790. It is our magna charter and every principle in it that is worth a farthing is taken from Magna Charter itself, as was the Declaration of Rights appended to the Constitution of 1776.... There is not a Constitution in this Union that has a Declaration of Rights appended thereto, perhaps with the exception of Massachusetts, that has not some article or some principle in it, taken from that Declaration of Rights of the State of Pennsylvania. It is one of the most perfect articles in any Constitution in the Union. It cannot be bettered; and therefore, upon principle, I am opposed to changing it.

∗ ∗ ∗ ∗ ∗ ∗

I, for one, will stand by the integrity of the old ninth article of the Constitution, the Bill of Rights, believing as I do that we have no right, in the first place, to alter or change it; and that, in the second

Moreover, *Reeves, Lester,* and *Lee* rejected the proposition urged by the majority herein despite the presence of an additional express right to privacy in the state constitution being construed in those cases; and the people of Florida have altered their constitution so as to overrule *Sarmiento.* Finally, I note that I find the expansive view of privacy embraced by the appellate courts of Alaska and Montana to be inconsistent with Pennsylvania law and public policy.[15]

## D.

Any reliance by the majority on *Commonwealth v. Thorpe,* 384 Mass. 271, 424 N.E.2d 250 (1981) is also misplaced. In *Thorpe,* the Massachusetts Supreme Court *rejected* statutory as well as state and federal constitutional claims that evidence derived from warrantless electronic

place, even if we have the power, we ought not to do so. I would say, in the language of one of America's sweetest poets—
> Woodman, spare that tree!
> Touch not a single bough!
> In youth it sheltered me,
> And I'll protect it now.

IV *Debates of the Convention* 659–60 (Harrisburg 1873).

**15.** *See generally* Eliason and NettikSimmons, *Right of Privacy,* 48 Mont.L.Rev. 1, 1–52 (1987); Note, *Alaska's Right to Privacy Ten Years After Ravin v. State: Developing a Jurisdiction of Privacy,* 2 Alaska L.Rev. 159, 159–83 (1985). I note the following for illustrative purposes. In *Ravin v. State,* 537 P.2d 494 (Alaska 1975), the Alaska Supreme Court declared that *the right to privacy in Alaska included the right of an adult to possess marijuana in the home for personal use.* In analyzing *Breese v. Smith,* 501 P.2d 159 (Alaska 1972), which found unconstitutional public school hair length regulations, an Alaska Law Review article notes:

Two statements made by the *Breese* court have had significant influence on the development of the right to privacy in Alaska. First, the court noted that the state courts were not limited by federal precedent when construing similarly-worded Alaska constitutional provisions. *States have a duty to 'move forward' and interpret state provisions more broadly than their federal counterparts. Moreover, the court recognized a judicial duty to develop additional rights not recognized under the federal Constitution.* These two statements continue to provide a significant foundation for an extension of the Alaska constitutional right to privacy beyond the limits set by federal precedent.

Note, *supra* at 163 (Footnotes omitted, emphasis added). I find no such mandate in the Pennsylvania Constitution.

participant monitoring of a uniformed police officer's conversations with the accused should be suppressed. The court expressly declined to rule on the merits of the *minority view* urged herein, and instead based its decision on the narrow facts presented. 424 N.E.2d at 258–59. Read in context, the Massachusetts Supreme Court's *dictum* that, "the better future course, and the most secure course constitutionally, is for law enforcement officials to procure warrants in cases where probable cause for surveillance can be shown, and even in cases where it does not appear that the statute requires a case where it does not appear that the statutes require a warrant," is no more than an application of the ancient dictum, *vis consili expers mole ruit sua* (literally, force without good sense falls by its own weight; colloquially, discretion is the better part of valor). 424 N.E.2d at 259; *see also* Kiehly, *Warrantless Electronic Surveillance in Massachusetts*, 71 Mass.L.R. 183, 183–93 (Winter 1986) (analyzing *Thorpe* ). Undoubtedly, securing a warrant is the safest course, statutorily and constitutionally. However, the question here is not which is the *safest* course, but whether the course in question is *constitutional*. On this issue, *Thorpe* offers only stony silence.

The majority also cite *People v. Beavers*, 393 Mich. 554, 227 N.W.2d 511 (1975), *cert. denied* 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975), wherein the Michigan Supreme Court held that, in absence of exigent circumstances, warrantless electronic participant monitoring of a private conversation in the target's own home constituted an unreasonable search and seizure under Mich. Const. Art. I, sec. 11 (analogous to the Fourth Amendment, and Pa. Const. Art. I, sec. 8).[16] Michigan's constitution has no express "right to privacy" provision like those construed in *Glass, Brackman, Reeves, Lester, Lee* and *Sarmiento;* hence, the major-

16. The Michigan Supreme Court limited the *Beavers* holding in two important respects: the court held that the admissibility of the informant's testimony was in no way affected by the inadmissibility of the monitoring officer's testimony; and the court held that the decision was to be applied prospectively. 227 N.W.2d at 516.

ity's reliance upon *Beavers* is more appropriate in that respect.

In *Beavers*, the Michigan Supreme Court recognized that, "[p]articipant monitoring is practiced extensively throughout the country and represents a vitally important investigative tool of law enforcement," but found that the warrant requirement was necessary because:

The interests of both the society and the individual should not rest upon the exercise of unerring judgment and self-restraint of law enforcement officials. Our laws must ensure that the ordinary, law-abiding citizen may continue to engage in private discourse, free to speak with uninhibited spontaneity that is characteristic of our society.

393 Mich. at 566, 227 N.W.2d at 515. While I agree that the unrestricted discretion currently vested in law enforcement personnel in Pennsylvania jeopardizes legitimate privacy interests of law-abiding citizens protected by the Pennsylvania Constitution, I cannot agree that application of the fullblown warrant requirement is necessary or appropriate.

### IV.

My primary disagreement with the majority relates to its conclusion that "any balancing of the needs of law enforcement against the rights of the citizen *has already been done* by the framers of the constitution who conditioned searches and seizures for the most part on the prior approval of a detached and neutral magistrate" and that "the constitutional standard is probable cause." Majority Opinion, *supra*, 370 Pa.Super. at 205, 536 A.2d at 367. (Emphasis added).

### A.

President Polk's vice president, George M. Dallas, once opined that, "the Constitution in its words is plain and intelligible, and it is meant for the homebred, unsophis-

ticated understandings of our fellow citizens." [17] To the contrary, however, by their very nature, there are great silences and ambiguities in any constitution, state or federal. *Accord McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819). Justice Oliver Wendell Holmes, Jr., explained:

> The great ordinances of the Constitution do not establish and divide fields of black and white. Even the more specific of them are found to terminate in a penumbra *shading gradually from one extreme to the other.*

*Springer v. Philippine Islands,* 277 U.S. 189, 209, 48 S.Ct. 480, 485, 72 L.Ed. 845 (1927). (Emphasis added).

With regard to the provisions of the Fourth Amendment, Professor LaFave has observed:

> The Fourth Amendment has the virtue of brevity and the vice of ambiguity. It does not define the probable cause required for warrants or indicate whether a warrantless search or seizure is inevitably 'unreasonable' if made without probable cause, so that the factual basis required for a constitutional search or seizure is unclear. The amendment does not define the relationship of the word 'unreasonable' to the clause setting forth the conditions under which warrants may issue; it is thus unclear when a judicial officer's approval must be obtained before an arrest or search is made. There is also uncertainty as to what official conduct is subject to the amendment's restraints, that is, just what actions amount to 'searches and seizures' and threaten the 'right of the people to be secure.' Finally, there is ambiguity concerning how that right is to be enforced; unlike the Fifth Amendment right against self-incrimination, no mention is made of barring from evidence the fruits of a violation of the amendment.

LaFave, "Search and Seizure" in 4 *Encycl. of Am. Const.* 1628 (1987). (Emphasis deleted). Professor LaFave's observations apply with equal force to Pa. Const. Art. I, sec. 8.

---

**17.** *Quoted in* Hickey, *supra* at n. 8, at xxvii; *also quoted in* Lieberman, *Milestones! Two Hundred Years of American Law,* Ch. 2, at 48 (1976).

## B.

In light of the ambiguous terms in which Pa. Const. Art. I, sec. 8 was drafted, I am unwilling to accept the majority's *dictum* that the needs of law enforcement (and society in general) have already been balanced against the rights of the individual to be free from searches and seizures. To accept this black and white analysis, I would also have to be willing to impose the fullblown warrant requirement on other non-traditional intrusions such as: airport metal detector and x-ray security searches; canine drug searches; school locker searches; and systematic drunk driving or license registration check-point/roadblock traffic stops. Each of these examples undeniably involves a search and/or a seizure. If our state constitution has already struck the balance, then these too must fall under the *"unreasonable per se"* rule of the majority. To this line of analysis, I must dissent. *Cf. Commonwealth v. Leninsky,* 360 Pa.Super. 49, 54–56, 519 A.2d 984, 987–88 (1986) (Kelly, J.).

I find that in rejecting the balancing approach, the majority impose upon Pa. Const. Art. I, sec. 8 a rigidity which our Supreme Court has rejected. In *Commonwealth v. Johnston, supra,* our Supreme Court reasoned:

We believe that the present case lacks the exigencies which were so important in *Terry,* and for that reason, the determination of whether there was a search cannot be made by balancing the privacy interests of the individual against the law enforcement objectives of government, and in this we disagree with the majority's analysis in *Place.* As Mr. Justice Brennan puts it, the balance has already been struck by the Fourth Amendment itself. *The issue under Pennsylvania law, then, and contrary to Place, is not whether a search occurred, for it is our view that it did, but whether the search that occurred should implicate the usual warrant requirements characteristic of police searches of private areas. This question necessarily involves a balancing analysis.* Thus, while we are unwilling to balance the privacy expectations of the individual against the law enforce-

ment interests of government for the purpose of determining whether there was a search, *we find the balancing inquiry appropriate to determine whether this particular kind of search in these circumstances necessarily implicates the fullblown warrant requirements of most other police searches.* Professor LaFave puts the question this way:

> *If the issue is framed in terms of whether a totally unrestrained use of such dogs in a dragnet fashion would be tolerable in a free society, one's answer might likely be no.* If so, then under the test earlier suggested as appropriate under *Katz,* such use of trained dogs to detect concealed contraband should be held to constitute a Fourth Amendment search. Yet it is clear that this particular surveillance technique amounts to a relatively minor intrusion upon privacy, much less than is involved, say, in the physical entry and ransacking of a house in an effort to find a quantity of narcotics. Because this is so, and because the use of trained dogs is a valuable surveillance technique which would be considerably hampered if it could be utilized only upon full probable cause and with search warrant in hand, from this perspective the push is in the direction of a holding that the use of trained dogs to detect concealed contraband is not a search. *This quite obviously leads to the question of whether there is some Fourth Amendment middle ground, that is, whether it is possible to subject this law enforcement practice to some restraints so as to ensure that it is not used in a dragnet fashion or in a random or unprincipled fashion, but yet not destroy its effectiveness by imposing all the limitations which are applicable to other, more traditional kinds of searches that are much more threatening to privacy and security.*

I *Search and Seizure* (2d Ed.) § 2.1(e), p. 315.

We believe that there is a Fourth Amendment middle ground applicable to the investigations conducted by police handlers of narcotics detection dogs.

515 Pa. at 465, 530 A.2d at 79. (Emphasis added). Thus, while a balancing approach is deemed inappropriate to determine whether an activity constitutes a search, a balancing approach is nonetheless *required* in determining whether a search is reasonable or unreasonable.

## V.

I believe that a Pa. Const. Art. I, sec. 8, middle ground is, likewise, applicable here. I agree with the majority that the current safeguards are inadequate to protect legitimate privacy interests of the vast law-abiding majority of the public. Nonetheless, I believe that with additional safeguards to ensure that electronic participant monitoring by law enforcement personnel is not used in a dragnet, arbitrary, or capricious fashion, the warrantless use of electronic participant monitoring could pass state as well as federal constitutional muster without imposing the fullblown warrant requirement. I set forth with specificity the type of additional safeguards I find to be minimally required first, and explain afterwards my reasons for adopting this view rather than that of the majority or that of Judge Rowley's dissent.

## A.

I find the following safeguards, or substantially similar safeguards, to be minimally required in order for warrantless electronic participant monitoring to be found to be reasonable, and therefore constitutional, under Pa. Const. Art. I, sec. 8:

1) a sworn affidavit by one of the investigative or law enforcement officers (18 Pa.C.S.A. § 5701) requesting authorization from the Attorney General, a District Attorney, or a Deputy Attorney General or Deputy District Attorney, properly authorized in writing (hereinafter authorizing attorney), to conduct electronic participant monitoring, setting forth:

a) a statement of the identity and qualifications of the investigative or law enforcement officers for whom authorization to participate in the monitoring is sought;

b) a statement of the identity of any person, not an investigative or law enforcement officer, for whom authorization to participate in the monitoring is sought, and any facts known relevant to a determination of the voluntariness of said person's participation;

c) a statement of facts giving rise to a *reasonable suspicion* that a crime listed in Pa.C.S.A. § 5708 has been, is being, or will be committed;

d) a statement of facts giving rise to a reasonable belief that the electronic participant monitoring proposed will secure material evidence of such criminal activity;

e) a statement of the facts known relevant to a determination of the reliability or credibility of the affiant's sources; and,

f) a statement of the identity of the person or persons whose communications are to be monitored, and the times, dates, placed, and methods of the monitoring proposed; and,

2) a memorandum of authorization signed by an authorizing attorney, setting forth:

a) a statement of the identity of each investigative or law enforcement officer authorized to participate in the electronic participant monitoring;

b) a statement of the identity of each person, not an investigative or law enforcement officer authorized to participate, whom the authorizing attorney has interviewed personally and whom the authorizing attorney has determined to have consented to participate voluntarily, and setting forth any facts known by the authorizing attorney relevant to the determination that the consent was voluntary;

c) a statement that the affidavit of the requesting officer has been personally reviewed by the authorizing attorney and has been found to sufficiently establish

reasonable suspicion that one of the offenses listed in 18 Pa.C.S.A. § 5708 has been, is being, or will be committed, and reasonable belief that the electronic participant monitoring authorized will secure material evidence of that criminal activity;

d) a statement of the person or persons whose communications are to be monitored, the times, dates, places, and methods of the monitoring, and any restrictions or minimization requirements imposed as a condition of the authorization, which shall include compliance with the provisions of 18 Pa.C.S.A. § 5714(a); and,

3) a final report in the form of a sworn affidavit or series of sworn affidavits, signed by each of the investigative or law enforcement officers who conducted the electronic participant monitoring, setting forth:

a) a statement containing the identity (if known) of the person or persons whose conversations were monitored, the times, dates, places, and methods of the monitoring and a brief summary of the contents of the communications; and

b) a statement of the occurrence or non-occurrence of any deviation from restrictions or conditions set forth in the memorandum of authorization and any relevant facts regarding the circumstances or reasons therefore; and,

4) the authorizing attorney would be required to secure and preserve, unaltered and intact, the affidavit of the requesting officer, the memorandum of authorization, the final report and the tapes of the monitoring, and be further required to produce the same when lawfully directed to do so by a court of competent jurisdiction.

I note that I do not find each component of the above safeguards to be individually constitutionally mandated; rather, I find that adequate restriction of the present unfettered discretion vested in law enforcement personnel is constitutionally required, and that the above safeguards

*collectively* meet that requirement without imposing the more restrictive probable cause/warrant requirement.[18]

### B.

According to the majority view (which the majority herein reject), a criminal's subjective expectation, that a confident-turned-informant will not be able to accurately or credibly establish the contents of incriminating statements made to the confidant, is neither legitimate nor reasonable. *See Caceres, supra.* Generally, I agree. The risk of disclosure of confidances by the parties to a private communication is inherent to all such communications; as Benjamin Franklin warned, "[i]f you would keep your secret from your enemy,

---

**18.** I note that electronic participant monitoring by state law enforcement personnel under the conditions outlined would have none of the offensive characteristics of writs of assistance and general warrants which James Otis railed against with fiery oratory in *Paxtons Case,* Quincy 51 (Mass.1761) and which both the Fourth Amendment and Pa. Const. Art. I, sec. 8 were intended to act as a "solemn veto against." *Wakely, supra.*

The authorization would be required to specify the person or persons whose communications were to be monitored; it would not be "universal," or be directed against "all subjects." Only those specifically authorized to participate would be permitted to conduct the monitoring; the authorization would not be "negotiable from one officer to another." The authority conferred is limited to the recordation of statements voluntarily disclosed to the informant, and it is restricted as to the time, place and method of the monitoring; it does not authorize the police or the informant to "break locks, bars, and anything else in his way" to enter the target's home or shop and conduct an unlimited search. A determination that any person, not an investigative or law enforcement officer, has voluntarily consented to participate would be required before such a person could be authorized to participate in the monitoring; no persons would be "compelled to assist in the search" against their will. A sworn affidavit establishing *reasonable suspicion* that a crime listed in 18 Pa.C.S.A. § 5708 had been, is being, or will be committed as well as a *reasonable belief* that material evidence of such an offense will be secured would be required; "bare suspicion without an oath" would not be sufficient. Lastly, the authorization would require a final report and delivery of the tapes to the authorizing attorney who would in turn be responsible for the production of the tapes upon lawful order of court; the authorization would not be "perpetual" and "without return." *See* 2 *Works of John Adams,* 523–25 (C. Adams ed. 1850) (setting forth Otis's argument); I *Orations of American Orator's* 20–24 (Starkweather ed. 1900) (same); *see also Marke, supra* (analyzing Otis's argument and its relation to the Fourth Amendment).

tell it not to a friend." Franklin, *Poor Richard's Almanac* (1751). It is well-settled, and undisputed by the majority herein, that in absence of a particular statutory prohibition (e.g.: marital privilege), a confidant may disclose the contents of private communications to the police, and the police may act upon such disclosures. *See Jacobson, supra* (citing cases).

I reject the notion that electronic participant monitoring must be considered significantly more invasive than unmonitored participant disclosure because it eliminates an accused's ability to challenge the accuracy or credibility of an informant's disclosures. I do not find that Pa. Const. Art. I, sec. 8 was intended to aid the accused in the creation of *false doubts* in the minds of the jurors as to the accuracy or credibility of an informant's disclosures. Rather, I find that Pa. Const. Art. I, sec. 8, was intended to prevent oppression, and not to assist criminals in efforts to erect barriers to the discovery of the truth. *Cf. White, supra*, 401 U.S. at 753, 91 S.Ct. at 1126–27. Furthermore, I note that while the opportunity to create false doubts regarding credibility or accuracy is removed by the existence of tapes of the disclosed communication, so too is the opportunity for Commonwealth witnesses to remember and recount such communications through a filter of advocacy, interest, and bias. Tapes of such communications will *dispassionately* acquit the innocent and convict the guilty; in this respect, electronic participant monitoring protects the rights of the accused, as well as those of society.

The majority argue, though, that the general fear of electronic participant monitoring will have a "chilling effect" on the free speech rights of the law-abiding public. Like the Louisiana Supreme Court, I find this anecdotal argument to be highly speculative. *See Reeves, supra*, 427 So.2d at 418; *see also* Kiehly, *supra* at 191 (state "chilling effect" analysis is "muddled somewhat" by the effect of the less restrictive federal standard; an increase in state restrictions would not remove whatever general chilling effect is caused by the less restrictive federal standard). None-

theless, I agree that if electronic participant monitoring were used in a dragnet, arbitrary, or capricious manner, the intrusion upon legitimate privacy interests of lawabiding citizens would be intolerable. Thus, under the LaFave analysis adopted in *Johnston, supra,* indiscriminate electronic participant monitoring by law enforcement personnel should be deemed to involve a search and seizure, albeit a non-traditional one.

Judge Rowley finds the restrictions in the statute to provide sufficient safeguards against abuse. Dissenting Opinion, per Rowley, J., *infra,* 370 Pa.Super. at 270–271, 536 A.2d at 400. I do not; rather, I find that 18 Pa.C.S.A. § 5704(2) lacks adequate safeguards to prevent dragnet, arbitrary or capricious use of electronic participant monitoring. Under the statute such monitoring may be employed "to intercept a wire or oral communication *involving suspected criminal activity.*" (Emphasis added). There are no limitations expressed as to the level of suspicion required or the type of criminal activity which would warrant the use of electronic participant monitoring. Moreover, under 18 Pa.C.S.A. § 5704(2)(i), when the participant to be monitored is an investigative or law enforcement officer, no approval of an authorizing attorney is required. *See Commonwealth v. Clark,* 349 Pa.Super. 255, 502 A.2d 1375 (1985). Thus, under the current statutory safeguards the police could, with or without approval of an authorizing attorney, conduct extended electronic participant monitoring to target any citizen based upon mere suspicion of a minor misdemeanor or summary offense such as jaywalking; this absurd example demonstrates the virtually unfettered discretion currently vested in the officers in the field. I find the allowance of such discretion to be unreasonable. *Cf. Commonwealth v. Swanger,* 453 Pa. 107, 112, 307 A.2d 875, 878 (1973) (disapproving "absolute, unreviewable discretion and authority" in the hands of the officer in the field); *Commonwealth v. Leninsky, supra* (same); *see generally* Martens, *The Fourth Amendment and Control of Police Discretion,* 17 U.Mich.J.L.Ref. 551 (1984).

I firmly believe, however, that the imposition of a probable cause/warrant requirement by the majority is excessively solicitous of the right to privacy and the *possible* chilling effect of the use of electronic participant monitoring on free speech. I do not believe that any appreciable chilling effect on the free speech rights of law-abiding citizens would result from the approval of warrantless electronic participant monitoring to be conducted consistently with the safeguards set forth *supra* at Part V, A.

The majority opines that, "[i]t is no great burden on the police to require that they restrict participant monitoring to cases where they can show probable cause for a warrant." Majority Opinion, 370 Pa.Super. at 205, 536 A.2d at 367. I cannot agree. As the instant case demonstrates, the probable cause standard, even applying the totality of circumstances test, constitutes a formidable barrier. While I agree with the majority that two sales of a small amount of marijuana at a suspect's home a week apart, with the last sale being five days prior to the request for a warrant to search the suspect's home, does not meet the burden of establishing probable cause for issuance of a warrant authorizing a search of the home, I can see no reason why those same facts should not form a sufficient predicate to authorize properly limited electronic participant monitoring.

Because not all crimes are committed in the bright light of day before swarms of credible and respected citizens, it is often necessary for the police to resort to the use of informants of dubious character, reliability, and credibility. In organized crime, many directors and managers of criminal operations deal exclusively through such nefarious characters. Without tools such as electronic participant monitoring to corroborate the disclosures of such informants, reasonable suspicions might never be developed into probable cause, lawful arrest, and just conviction. I find that the risk of a chilling effect on free speech rights of the public in general, and the risk of *unreasonable* intrusions upon legitimate privacy interests of individuals are diminished and overcome by compelling countervailing societal inter-

ests in bringing criminals to justice when approval of electronic participant monitoring by law enforcement personnel is conducted consistently with the safeguards set forth *supra* at Part V, A. Nonetheless, because the monitoring conducted in the instant case was not conducted in accordance with such safeguards, I agree that the monitoring constituted an unreasonable search and seizure under Pa. Const. Art. I, sec. 8.

## VI.

We must then determine what the effect of the constitutional infirmity has upon the evidence derived from the electronic participant monitoring. The majority conclude that the tapes of the electronic participant monitoring, statements of the monitoring officer, and the fruits of the execution of the April 6, 1984 search warrant should have been suppressed. I find that even assuming, *arguendo,* that the tapes and the monitoring officer's statements should have been suppressed, suppression of the fruits of the execution of the search warrant was neither necessary nor appropriate. Because I would find the fruits of the search admissible, and because neither the tapes nor the statements of the monitoring office were offered or admitted into evidence during appellant's bench trial, I would affirm judgment of sentence. Although I find no need to decide the broader issue of whether a state constitutionally mandated exclusionary rule would have required suppression of the tapes and the monitoring officer's statements, *for the purposes of discussion,* I will *assume* that suppression would be required.[19]

---

**19.** I note, however, that in *Commonwealth v. Williams,* 454 Pa. 368, 312 A.2d 597 (1973), our Supreme Court explained:
> a prophylactic exclusionary rule is applied only in extreme cases where all other attempts to secure compliance have proven unsuccessful. *See generally Mapp v. Ohio,* 367 U.S. 643, 651–52, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In this area there has been no showing of widespread flagrant disregard to justify formulation of such a rule at this time.

454 Pa. at 372, 312 A.2d at 600. The construction given Pa. Const. Art. I, sec. 8 by the majority in this case imposes limitations on police powers heretofore unknown in this Commonwealth. Thus, while

## A.

The majority find that with the redaction of the monitoring officer's statements from the affidavit in support of the April 6, 1984 search warrant, and with application of the rule announced in *Commonwealth v. Burke*, 235 Pa.Super. 36, 42, 340 A.2d 524, 527 (1975), the affidavit contains insufficient facts to establish probable cause to sustain the validity of the search warrant. *See* Majority Opinion, *supra*, 370 Pa.Super. at 217–221, 536 A.2d at 373–375. Applying the totality of circumstances test adopted in *Commonwealth v. Gray, supra*,[20] I agree with the majority's reasoning on this point. I note that the totality of circumstances test is to be applied to the redacted affidavit of probable cause and not the record as a whole. Upon review of the redacted affidavit, I find that there are simply insufficient facts averred to justify issuance of a warrant to search a home.

I also agree with the majority that *in determining the validity of the warrant,* we are limited to the four corners of the supporting affidavit. Pa.R.Crim.P. 2003(b). *For this limited purpose,* it is absolutely irrelevant whether the informant relayed additional information to the police or whether the police in turn relayed that information to the issuing authority. *Commonwealth v. Morris*, 368 Pa.Super. 237, 240 & n. 2, 533 A.2d 1042, 1044 & n. 2 (1987) (information not contained in probable cause affidavit but

violations of these newly announced limitations may have been widespread, they could not reasonably be characterized as flagrant as until this day the overwhelming weight of authority held such conduct to be constitutional. Consequently, formulation of a prophylactic exclusionary rule for application in this case would not appear to be justified under our Supreme Court's reasoning in *Williams*.

**20.** Adoption of the totality of circumstances test has not diminished the standard for probable cause nor has it removed the necessity of establishing that the officer reasonably relied upon the hearsay statements of third parties; rather, it merely acknowledges that in some circumstances the police may possess information from third party sources which would not meet the rigid *Aguilar–Spinelli* test, but which nevertheless would warrant the reliance of a reasonably prudent man. *See Gray, supra; see also Commonwealth v. Sorrell*, 319 Pa.Super. 103, 112, 465 A.2d 1250, 1253 (1983).

disclosed to issuing authority does not affect the validity of the warrant, but it is relevant to the issue of whether the police acted in good faith reliance on an invalid warrant). The warrant must, therefore, be deemed invalid.

## B.

The fact remains, however, that the police took their affidavit of probable cause to a neutral and detached magistrate who examined it and issued a facially valid warrant based upon the information contained therein. Under federal law, the good faith exception to the federal exclusionary rule would apply so as to permit the admission of the fruits of the search which was based upon a facially valid warrant even though it was later determined to have been issued based upon an affidavit which failed to contain sufficient facts to establish probable cause. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *see also Illinois v. Krull,* 480 U.S. ——, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (*Leon's* good faith exception applied where reliance on statute authorizing warrantless administrative search was objectively reasonable); *Maryland v. Garrison,* 480 U.S. ——, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (*Leon's* good faith exception applied where execution of warrant which was later discovered to have been overly broad was, nonetheless, objectively reasonable); *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) (*Leon's* good faith exception applied where officer's reliance upon technically, but facially, defective warrant was objectively reasonable); *Commonwealth v. Mason,* 507 Pa. 396, 405 n. 2, 490 A.2d 421, 426 n. 2 (1985) (summarizing the federal rule); Annotation, *Admissibility in Criminal Case of Evidence Obtained by Law Enforcement Officer Allegedly Relying Reasonably and in Good Faith on Defective Warrant,* 82 L.Ed.2d 1054 (1986 & 1987 Supp.) (collecting and analyzing cases); Kamisar, *Introduction: Trends and Developments with Respect to that Amendment "Central to Enjoyment of Other Guarantees of The Bill of Rights,"* 17 U.Mich.J.L.Ref. 409, 409 n. 4

(1984) (collecting authorities analyzing, commending, or criticizing the *Leon* "good faith" exception).

The majority find, however, that a *Leon* type good faith exception to a state constitutionally mandated exclusionary rule cannot apply in this case because it was *per se* unreasonable for the police to believe that 18 Pa.C.S.A. § 5704 authorized them to conduct warrantless electronic participant monitoring, and therefore, it was unreasonable for them to believe that the warrant, based *in part* on evidence derived from the monitoring, was valid. The majority note that the warrant in the instant case was issued prior to the panel decision in *Harvey, supra*,[21] and conclude that because *express* state appellate court authorization was lacking, reliance was therefore unreasonable. I cannot agree; while express state appellate court authorization was indeed lacking, I nonetheless find reliance on the warrant to be eminently reasonable under the circumstances.

## C.

The majority note that prior to the effective date of the Wiretapping and Electronic Surveillance Act, warrantless electronic participant monitoring by law enforcement personnel was a second degree misdemeanor. Majority Opinion, *supra*, 370 Pa.Super. at 184, 536 A.2d at 356. This fact, however, presents an incomplete picture of the history of the *statutory* right to privacy regarding oral and wire communications in Pennsylvania.[22]

**21.** I note that it was also issued prior to the panel decision *Commonwealth v. Beauford*, 327 Pa.Super. 253, 475 A.2d 783 (1984), *appeal dismissed* 508 Pa. 319, 496 A.2d 1143 (1985) (holding unconstitutional *non-participant* monitoring of private communications via "pen register" devices).

**22.** The first law regarding this subject was passed in Pennsylvania in 1851. Act of April 14, 1851, No. 331, § 7, P.L. 612. The 1851 act made it a crime for a telegraph employee to use or divulge the contents of a telegraph dispatch "without consent or direction of *either* the party sending *or* receiving," unless the dispatch was sent "with a view to general publicity." (Emphasis added). The penalties for violation of the 1851 act were increased in 1860. Act of March 31, 1860, No. 374, § 72, P.L. 382. In 1901, the proscriptions of the 1851 act were extended to persons connected with the provision of tele-

Electronic participant monitoring of oral (non-wire) communications by law enforcement personnel was severely limited between February 21, 1975 and December 3, 1978; any failure to comply with the procedures then set forth in 18 Pa.C.S.A. § 5705(c)(3) could have resulted in liability for a second degree misdemeanor. However, before February

phone services; the exception for use or disclosure with "consent or direction of either the party sending or receiving" remained. Act of July 10, 1901, No. 330, §§ 1, 2, P.L. 651. The 1901 act was reenacted and codified with only minor changes to the penalty provisions in 1939. Act of June 24, 1939, No. 375, § 688, P.L. 872; 18 P.S. § 4688. (Such legislation was apparently necessary to foster acceptance of both the telegraph and the telephone as a secure means of private communication. I note that the limitations upon disclosure of private information by incidental/commercial conduit parties to communications recognized in *DeJohn, supra,* and *Beauford, supra,* involve analytically similar implicit economic necessity considerations).

In 1957, the legislature enacted a new statute which differed in material respects from its predecessors. Act of July 16, 1957, No. 411, §§ 5701–5704, P.L. 1482. The act, for the first time, required consent of all parties to the telegraph or telephone communication in order to authorize use or disclosure of the contents of the communication. Also for the first time, the act contained a statutory exclusionary rule applicable to information derived in violation of the act. In 1972, the 1957 act was codified at 18 Pa.C.S.A. §§ 5701–5704 and entitled "Invasion of Privacy." Act of December 6, 1972, No. 334, §§ 5701–5704, P.L. 1482. No substantive changes were made to the provisions of the 1957 act.

In 1974, amendments were made to 18 Pa.C.S.A. § 5701–5704, which, for the first time, brought use or divulgence of oral communications other than those transmitted by telephone or telegraph under statutory restrictions. Act of December 27, 1974, No. 327, §§ 5701, 5703–5705, P.L. 1007 (effective February 21, 1975). Under the 1974 amendments, it was a misdemeanor of the second degree for any person to use any electronic, mechanical or other device to intercept a private conversation without consent of all the parties. 18 Pa.C.S.A. § 5705. A narrow exception was included for electronic participant monitoring by law enforcement personnel to ensure the personal safety of an undercover law enforcement officer. 18 Pa.C.S.A. § 5705(c)(3). The exception required authorization by a designated official and approval of a judicial official; monitoring but not recording was permitted under this exception.

In 1978, the legislature enacted the Wiretapping and Electronic Surveillance Act which substantially altered the law regarding use and divulgence of both oral and wire communications. Act of October 4, 1978, No. 1978–164, P.L. 831 (effective December 3, 1978). Significantly, the legislature adopted 18 Pa.C.S.A. § 5704(2) which, under specified conditions, exempted electronic participant monitoring by law enforcement personnel from the statutory restrictions and prohibitions which had been imposed by the 1974 and 1957 acts.

21, 1975, no statutory restrictions or prohibitions applied to electronic participant monitoring of oral (non-wire) communications; moreover, after December 3, 1978, electronic participant monitoring by law enforcement officials of either wire or oral communications was exempted from any statutory restrictions or prohibitions providing the monitoring was conducted in compliance with 18 Pa.C.S.A. § 5704. Thus, in the instant case, the police and the issuing authority reasonably and correctly believed that no statutory restriction applied to electronic participant monitoring conducted in accordance with 18 Pa.C.S.A. § 5704.

### D.

The majority correctly notes that in April of 1984, when the electronic participant monitoring involved in the instant case occurred, no Pennsylvania state appellate court had expressly held that electronic participant monitoring by law enforcement personnel in accordance with Pa.C.S.A. § 5704 was constitutional under Pa. Const. Art. I, sec. 8. I do not believe, however, that the absence of such express appellate approval rendered the police's or the issuing authority's belief in the legality of the monitoring and the validity of the warrant unreasonable.

By April 6, 1984 (when the warrant in question was issued), the United States Supreme Court had already delivered its opinions in *Jacobson, Caceres, White,* and *Kauffer.* The Pennsylvania Supreme Court had cited *United States v. White, supra,* as authority in *Commonwealth v. Glover,* 446 Pa. 492, 498–99, 286 A.2d 349, 352 (1972), and this Court had applied *White* in rejecting a claim that electronic participant monitoring by law enforcement personnel violated the target's *federal* constitutional rights. *Commonwealth v. Donnelly,* 233 Pa.Super. 396, 408–13, 336 A.2d 632, 638–41 (1975), *allocatur refused* 233 Pa.Super. xxxvi (Pa.1975), *cert. denied* 424 U.S. 974, 96 S.Ct. 1477, 47 L.Ed.2d 744 (1976). Although neither state appellate court decision involved a challenge to the constitutionality of warrantless electronic participant monitoring under Pa. Const. Art. I,

sec. 8, it is significant that there is not the slightest hint in those decisions that a different result would obtain under state law. Indeed, the Supreme Courts of Louisiana, Michigan, and West Virginia construed *Donnelly* as bringing Pennsylvania in line with the federal rule. *See State v. Reeves, supra,* 427 So.2d at 416; *People v. Drielick,* 400 Mich. 559, 568 n. 11, 255 N.W.2d 619, 622 n. 11 (1977); *Blackburn v. State,* 290 S.E.2d 22, 32 (W.Va.1982). Moreover, while Pennsylvania state appellate courts had not yet addressed the issue, a federal district court sitting in Pittsburgh had published an opinion analyzing Pennsylvania caselaw and concluding that electronic participant monitoring in accordance with 18 Pa.C.S.A. § 5704 *did not* violate Pa. Const. Art. I, sec. 8. *See United States v. Geller,* 560 F.Supp. 1309, 1314–17 (E.D.Pa.1983); *aff'd sub nom. United States v. DeMaise,* 745 F.2d 49 (3rd Cir.1984); *cert. denied* 469 U.S. 1109, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985).

I simply cannot agree that the belief of the police or the issuing authority—that the evidence derived from the electronic participant monitoring was constitutionally obtained and that the warrant issued *in part* on that evidence was valid—was unreasonable. After the search warrant was issued in this case, five separate panel decisions of this Court reached the same conclusion regarding the constitutionality of warrantless electronic participant monitoring by law enforcement personnel. *Commonwealth v. Frank,* 357 Pa.Super. 442, 516 A.2d 64 (1986) (per Wieand, J.; Beck and Watkins, JJ., join); *Commonwealth v. Rodriguez,* 356 Pa. Super. 543, 515 A.2d 27 (1986) (per Wickersham, J.; Brosky and Watkins, JJ., join); *Commonwealth v. Harvey, supra* (per Wieand, J.; Johnson and Montgomery, JJ., join); *Commonwealth v. Doty,* 345 Pa.Super. 374, 498 A.2d 870 (1985) (per Wieand, J.; Del Sole and Popovich, JJ., join); *Commonwealth v. Hassine,* 340 Pa.Super. 318, 490 A.2d 438 (1985) (per Montemuro, J.; Spaeth, P.J., and Popovich, J., join). While these decisions may have been erroneous, are we to find that they were also "unreasonable?" I certainly am unwilling to do so.

I find the police officer's reliance upon the facially valid April 6, 1984 search warrant to have been *objectively reasonable.* There is no indication in the instant case of an intent to evade the law. Had the rules announced in the instant case (of the majority or of this author) been known or even suspected, I have no doubt the Commonwealth *could have and would have* obtained lawful authorization for the electronic participant monitoring, and a valid search warrant. Succinctly, this case involves precisely the kind of reasonable good faith (but erroneous) reliance on a facially valid search warrant to which the *Leon* good faith exception was intended to apply.

## E.

In *Commonwealth v. Montgomery,* 513 Pa. 138, 518 A.2d 1197 (1986), our Supreme Court stated:

In *Commonwealth v. Mason,* 507 Pa. 396, 406 n. 2, 490 A.2d 421, 426 n. 2 (1985), we expressly reserved the question of 'whether the Pennsylvania Constitution itself, Article I, Section 8, would compel the exclusion of evidence obtained in violation thereof, [or] whether a state constitutional exclusionary rule would be applied in a manner co-extensive with its federal counterpart.' This case appeared at first blush to give us the opportunity to address these important exclusionary rule issues.

A careful review of the record, however, reveals that the Commonwealth did not properly preserve the exclusionary rule issue, therefore we are constrained from considering it herein.

513 Pa. at 142–43, 518 A.2d at 1199; *see also Commonwealth v. Revtai,* 516 Pa. 53, 61, 532 A.2d 1, 5 (1987). The existence and scope of a *state* constitutionally mandated exclusionary rule in Pennsylvania remains an open question.

In considering whether and to what extent an independent state constitutionally mandated exclusionary rule should be recognized in Pennsylvania, it should be noted that prior to *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), Pennsylvania steadfastly refused to

adopt the federal exclusionary rule as a matter of state law. *See Commonwealth v. Voci,* 393 Pa. 404, 143 A.2d 652 (1958); *Commonwealth v. Chaitt,* 380 Pa. 532, 112 A.2d 379 (1955); *Commonwealth v. Bruno, supra,* 203 Pa.Super. at 557–59 n. 5, 201 A.2d at 441–448 n. 5 (1964) (collecting pre-*Mapp* cases). In *Commonwealth v. Chaitt, supra,* our Supreme Court stated:

> We start with the fundamental principle of the common law that the admissibility of evidence is not affected by the illegality of the means by which it was obtained. That rule, which has persisted uninterruptedly in the several jurisdictions of the United Kingdom and the British Commonwealth of Nations and in an overwhelming number of the States which have had occasion to consider the question, has also been firmly entrenched in the decisions of the appellate courts of our own Commonwealth.

380 Pa. at 535, 112 A.2d at 381 (footnote collecting cases omitted); *see also Commonwealth v. Ryan, supra* at n. 3, at 459–60 (1934) (collecting cases); *Commonwealth v. Street, supra* at n. 3, at 794–98 (1923) (exhaustively collecting and analyzing early cases and authorities).

Even assuming, *arguendo,* that some form of state constitutionally mandated exclusionary rule will eventually be adopted by our Supreme Court, I am unwilling to assume that the fruits of the execution of the April 6, 1984 search warrant would fall within the ambit of such a rule. It would be incongruous and ironic if under the banner of "new federalism" this Commonwealth were to recognize a state constitutionally mandated exclusionary rule broader than the federal rule which we resolutely resisted under the banner of "old federalism" (states' rights) until we were forced to apply it by the compulsion of the supremacy clause of the federal constitution.

Based upon the foregoing, I find that the trial court's denial of the motion to suppress the fruits of the execution of the April 6, 1984 search warrant was proper even though the prior electronic participant monitoring was unconstitu-

tional, and even if we assume that the tapes and the monitoring officer's testimony must be suppressed and that the warrant itself was invalid. Succinctly, I find the police officer's reliance upon the facially valid warrant to be objectively reasonable, and therefore, find suppression of the fruits of its execution to be unnecessary and inappropriate.

## CONCLUSION

I agree with the majority that the electronic participant monitoring conducted in the instant case violated Pa. Const. Art. I, sec. 8. The provisions of 18 Pa.C.S.A. § 5704(2)(i) and (ii) leave virtually unrestricted discretion in the hands of the law enforcement personnel (§ 5704(2)(i)) and prosecuting attorney's designated to authorize electronic participant monitoring (§ 5704(2)(ii)), and thereby imperil legitimate privacy interests of law-abiding citizens which Pa. Const. Art. I, sec. 8 is designed to protect. Therefore, I concur in part.

However, I do not agree with the majority that a warrant issued by a judicial officer based upon probable cause is an irreducible prerequisite to the constitutional use of electronic participant monitoring under Pa. Const. Art. I, sec. 8; rather, I would find the safeguards set forth in Part V, A of this opinion sufficient. Nor do I agree that the unconstitutionality of the electronic participant monitoring renders the fruits of the execution of the April 6, 1984 search warrant inadmissible under Pennsylvania law. Rather, I find that the police acted in objectively reasonable, good faith reliance on a facially valid (but defective) warrant; and therefore, exclusion of the fruits of the execution of the warrant is unnecessary and inappropriate. Finally, because neither the tapes of the monitoring nor any statements of the monitoring officer were admitted during appellant's bench trial, I find any error in failing to suppress that evidence to have been harmless beyond a reasonable doubt and would affirm judgment of sentence. Therefore, I respectfully dissent in part.

BECK, Judge, concurring and dissenting:

I concur in Part I of the majority's opinion with the understanding that the opinion decides the issue of whether a warrant is required for "participant monitoring" only when such monitoring occurs inside a *home*.

I join in the dissenting opinion by Judge Olszewski as to his view that the warrant in question satisfies the "totality of the circumstances" standard and was therefore properly issued.

ROWLEY, Judge, dissenting:

I respectfully dissent. Unlike the majority, I am of the opinion that the General Assembly clearly and unambiguously intended, and provided in 18 Pa.C.S. § 5704(2)(ii), for the warrantless interception and recording of oral communications between a consenting informant and a third person engaged in suspected criminal activities. The words of a statute must be given their plain meaning. *Com. v. Stanley*, 498 Pa. 326, 446 A.2d 583 (1982). "When a statute is not ambiguous and the wording clear, then the letter of [the] statute may not be circumvented on the pretext of pursuing its spirit." *Chesler v. Government Employees Ins. Co.*, 302 Pa.Super. 356, 361, 448 A.2d 1080, 1082, (1982), revd. on other grounds 503 Pa. 292, 469 A.2d 560 (1983), amended on other grounds 504 Pa. 426, 475 A.2d 102 (1984). I would not, therefore, circumvent what I perceive to be the plain meaning of § 5704(2)(ii) in order to make the section compatible with the majority's construction of Pennsylvania Constitution, Art. I, § 8.

However, I am also of the opinion that § 5704(2)(ii), as I read it, not only does not violate the United States Constitution, but it also does not violate Art. I, § 8 of the Pennsylvania Constitution. Section 5704(2)(ii) does not give unlimited and indiscriminate authority to law enforcement officials. On the contrary, to trigger the application of § 5704(2)(ii), there must be suspected criminal activity afoot, the informant must voluntarily consent to the interception and the Attorney General or District Attorney or their respective

deputies, must give prior approval for the interception. Furthermore, the interception when it occurs, is subject to the requirements of § 5714(a) and custody of the recorded evidence is to remain in the Attorney General, the District Attorney, or their deputies. These limitations are sufficient to guard against the unlimited and indiscriminate use of such interceptions and the evidence obtained therefrom and act as an adequate deterrent to innappropriate police activity. Moreover, such limitations drastically minimize the likelihood of an invasion of the lawabiding citizen's legitimate expectations of privacy. As a result, I would hold that the trial court properly refused to suppress the evidence obtained as a result of the consensual participant monitoring utilized in this case. Therefore, I would affirm the Judgment of Sentence for all of the reasons set forth in *Commonwealth v. Harvey*, 348 Pa.Super. 544, 502 A.2d 679 (1985).

Recognizing, however, that the majority has determined that a warrant is required in circumstances like those before us, were I to reach the question of whether there was probable cause to obtain the warrant in this case, I would agree with Judge Beck and Judge Olszewski that the affidavit here adequately established probable cause.